Mathias H. WILDEN, Petitioner,

v.

Ogis FIELDS, Warden, F.C.I., Oxford, Respondent.

No. 79–C–347.

United States District Court, W. D. Wisconsin.

March 2, 1981.

Daphne Webb, Madison, Wis., for petitioner.

Richard Cohen, Asst. U. S. Atty., Madison, Wis., for respondent.

## ORDER

CRABB, Chief Judge.

This is a petition for a writ of habeas corpus in which petitioner, an inmate at the Federal Correctional Institution at Oxford, Wisconsin, challenges the validity of the guidelines under which the United States Parole Commission determines the length of custody of inmates sentenced to federal institutions. The importance of this issue and the frequency with which it is raised by federal prisoners warrant extensive analysis of the source of the parole commission's authority to promulgate and observe standardized guidelines in the parole decision process.

In his petition, petitioner alleges that on September 14, 1970, he was sentenced, in Canada, to life imprisonment; that on October 13, 1978, petitioner was transferred from Canada to the United States pursuant to a treaty; that on December 2, 1978, petitioner was served with a "Notice of Hearing" in which it was stated only that petitioner would meet with the parole commission in "the month of January, 1979"; that the vagueness of the notice concerning

the time petitioner's hearing was to be held prevented petitioner from retaining counsel to represent him at his hearing; that approximately three months after he was received into federal custody, in January, 1979, petitioner appeared before the parole commission; that he was denied parole and continued "for a four-year reconsideration hearing in January, 1983"; that in formulating its decision to deny him parole, the commission failed to consider petitioner's exceptional institutional behavior; that the commission used a police report of the crime and a "post-sentence" report prepared by American authorities nine years after the date of petitioner's offense in deciding petitioner's eligibility for release on parole; that the reports contained contradictory information; that it appears that the commission relied on some or all portions of the contradictory reports which disfavored petitioner; and that its reliance on false information affected the offense severity category within which the parole commission placed petitioner.

Petitioner further alleges that the reasons given him for denial of parole were set out in "boilerplate language"; that the parole guidelines are contrary to the Parole Commission Reorganization Act and are unlawful for a number of reasons enumerated in the petition.

Finally, petitioner alleges that following his January, 1979, hearing, on the same day the hearing was held, he requested a copy of the recording of his hearing so that he could prepare an administrative appeal; that the Privacy Act requires such requests to be honored within 40 working days; that petitioner did not receive a copy of the tape of his hearing within the time period prescribed; that inmates are provided with little more than 40 working days within which to appeal a decision of the parole board or effectively waive their chance to appeal; that because petitioner did not timely receive the record of his hearing, he wrote to the National Appeals Board Ana-

lyst to request an enlargement of time in which to appeal; that because a grant of his request for an enlargement of time was not given petitioner until after the time for appeal had run, petitioner was compelled to prepare and submit an appeal without the benefit of the record of his hearing; and that, on appeal, the Regional Commission deemed petitioner's case an "original jurisdiction" case and did not notify petitioner of its designation until after the decision had been made.

Respondent has moved for summary judgment, based upon a stipulation of fact prepared by counsel for both parties. From that stipulation, I find that there is no genuine issue with respect to any of the following material facts.

## FACTS

Petitioner was sentenced on September 14, 1970, by the Provincial Court of Ontario, Canada, to a life sentence for murder. He was part of the prisoner exchange treaty and has been in the custody of the Attorney General since October 13, 1978.

Petitioner had his initial parole hearing at the Federal Correctional Institution, Oxford, Wisconsin, on January 17, 1979, before a panel of commission hearing examiners. During the hearing the examiner panel discussed with petitioner his offense behavior, allowing him to inform the panel of the details of the offense, his prior criminal record, institutional adjustment and social history items such as education, employment record, marital and family status, and drug/alcohol dependence. The panel relied upon a Canadian crime report dated December 4, 1970, a postsentence report dated November 13, 1978, and a report prepared by institutional staff dated January 12, 1979, for the official information on the above issues.

At the hearing the panel evaluated petitioner's case under the paroling policy guidelines found at 28 C.F.R. § 2.20 (1979).[1] The panel rated petitioner's offense behav-

---

1. Unless otherwise indicated, all references to commission guidelines in this opinion are to those published in the 1979 volume of 28 C.F.R.

ior as greatest II severity because he participated in a robbery which resulted in the death of a person by beating. Petitioner's parole prognosis (the likelihood of remaining at liberty without violating the terms of his release) was evaluated by utilizing the salient factor scoring device also set forth at 28 C.F.R. § 2.20. Petitioner was given a score of 5 which indicated he was a "fair" parole risk. At the time of the hearing petitioner had been in custody approximately 100 months. With his offense severity rating and parole prognosis the suggested guideline range of months to be served before release, with good institutional adjustment and program performance, was determined to be in excess of 85 months.

During the hearing the panel also noted that petitioner had incurred a disciplinary infraction during his period of confinement for fashioning a metal knife in the metal shop. On the positive side, petitioner's overall institutional adjustment was described as excellent, petitioner having completed some college courses, receiving a certificate for completing a welding course and receiving excellent work reports.

At the conclusion of the hearing the examiner panel informed petitioner that his case was being referred to the Regional Commissioner for original jurisdiction consideration along with a recommendation to continue for a four-year reconsideration hearing in January, 1983. As noted in the recording of the January 17, 1979, hearing, petitioner was also informed by the examiner panel that its recommendation was not intended to depreciate his good institutional adjustment but was being made to hold him accountable for a very serious offense.

By notice of action dated January 31, 1979, petitioner was informed that his case had been designated as original jurisdiction and had been referred to the National Commissioners for a decision. This action was taken pursuant to 28 C.F.R. § 2.17(b)(4).

Subsequent to consideration of all relevant factors by the National Commissioners, petitioner's case was continued for a four-year reconsideration hearing in January, 1983. Petitioner was so advised of this decision by notice of action dated March 9, 1979. Petitioner was also advised that he had been scheduled for a statutory interim hearing in January, 1981.

Petitioner appealed the commission's decision to the National Commissioners pursuant to 28 C.F.R. § 2.27 on April 8, 1979. By notice of action dated June 22, 1979, petitioner was advised that the previous decision had been affirmed.

By letter dated January 17, 1979, petitioner made a request to the commission for a copy of the cassette recording and hearing summary of his January 17, 1979, hearing. On February 14, 1979, the commission responded to petitioner, advising him that his file material had been forwarded to Washington, D.C. and upon its return the commission would comply with his request. On April 16, 1979, the commission complied with petitioner's Privacy Act request.

## OPINION

Petitioner bases his challenge to the action of the parole commission on two main arguments: first, the guidelines employed by the commission are not valid under the Parole Commission and Reorganization Act of 1976 (PCRA); and second, various actions of the commission in denying petitioner parole violated the Constitution, the PCRA, or both. Before turning to the acts of the commission in this case, I will consider generally the PCRA and the validity of the "Guidelines for Decisionmaking."

## I. VALIDITY OF THE GUIDELINES

■ Prior to 1973, the United States Board of Parole (now the United States Parole Commission, 18 U.S.C. § 4201 et seq. (1976)) employed a system of unstructured discretion with few procedural safeguards in the parole determination process. See Project, Parole Release Decisionmaking and the Sentencing Process, 84 Yale L.J. 810, 820–822 (1975). Responding to criticism that the parole process contained inadequate procedures and no standards for exercising discretion, in 1973 the Board of Parole adopted a nationwide system of guide-

lines to be used in making parole decisions. Those guidelines are essentially the same as those employed today by the United States Parole Commission. 28 C.F.R. § 2.20.

## A. Provisions of the Guidelines

The guidelines consist of two scales which determine the "customary total time" to be served before parole ordinarily will be granted. One scale—the "salient factor score"—measures the risk of allowing a particular inmate to be released on parole. This score consists of a rating from one to eleven, with the higher numbers indicating that the prisoner is a better parole risk. In calculating the salient factor score, the commission rates such things as prior convictions and employment history. 28 C.F.R. § 2.20.

The other scale is an "offense severity rating." Here, the commission has placed a number of criminal offenses into seven severity levels—low, low moderate, moderate, high, very high, greatest I and greatest II—without regard to the actual sentences imposed for the offenses. The offenses used on this scale are not necessarily violations of different statutes; for example, tax evasion of an amount less than $2,000 is given a "low" rating, while tax evasion of an amount from $2,000 to $19,999 is given a "moderate" rating. (The commission guidelines and tables are appended to this order.)

After determining the offense severity and calculating the salient factor score, the commission places a particular inmate's score and severity rating on a matrix, and thus arrives at the customary total time to be served before release. Although regulations allow for decisions outside the guidelines, 28 C.F.R. § 2.20(c), it appears that most inmates are released after serving at least the customary total time. *See e. g., Geraghty v. United States Parole Commission*, 579 F.2d 238, 255 (3d Cir. 1978); *Kortness v. United States*, 514 F.2d 167, 169 (8th Cir. 1975). This result, if accurate, should be expected, inasmuch as the PCRA contemplates that most parole decisions will be made pursuant to the guidelines. *See* 18 U.S.C. § 4206 (1976).

## B. The Parole Commission Reorganization Act

In 1976, Congress passed the PCRA which gave the newly-created parole commission the power and duty to:

promulgate rules and regulations establishing guidelines for the powers [to grant or deny parole and] to carry out a national parole policy....

18 U.S.C. § 4203(a)(1) (1976).

The guidelines are to be used in making parole decisions in accordance with the following statutory criteria:

(a) If an eligible prisoner has substantially observed the rules of the institution or institutions to which he has been confined, and if the Commission, upon consideration of the nature and circumstances of the offense and the history and characteristics of the prisoner, determines:

(1) that release would not depreciate the seriousness of his offense or promote disrespect for the law; and

(2) that release would not jeopardize the public welfare; subject to the provisions of subsections (b) and (c) of this section, and pursuant to guidelines promulgated by the Commission pursuant to section 4203(a)(1), such prisoner shall be released.

18 U.S.C. § 4206 (1976).

The statute provides also that:

In making a determination under this chapter (relating to release on parole) the Commission shall consider, if available and relevant:

(1) reports and recommendations which the staff of the facility in which such prisoner is confined may make;

(2) official reports of the prisoner's prior criminal record, including a report or record of earlier probation and parole experiences;

(3) presentence investigation reports;

(4) recommendations regarding the prisoner's parole made at the time of sentencing by the sentencing judge; and

(5) reports of physical, mental, or psychiatric examination of the offender. There shall also be taken into consideration such additional relevant information concerning the prisoner (including information submitted by the prisoner) as may be reasonably available.

18 U.S.C. § 4207 (1976). Thus, the statute vests the commission with broad discretion in individual parole decisions.

In support of his contention that the guidelines are illegal under the PCRA, petitioner makes several arguments which are not cogent to an interpretation of the statute.[2] For example, petitioner points to a study upon which the parole commission supposedly based its guidelines for decision-making.[3] The validity of such a study is not relevant to a determination of whether the guidelines are valid under the statutes.[4] Petitioner argues further that the guidelines have never been expressly ratified by Congress. Because there is no requirement under the PCRA that Congress expressly ratify the guidelines, this argument too must fail. The issue is whether the guidelines comport with the Act and its underlying legislative intent. Finally, petitioner cites a bill pending before Congress as "evidence" of what that body did or did not intend when it passed the PRCA. A bill *pending* before Congress, however, cannot serve as evidence of the intent of Congress when it *passed* another bill into law. Other arguments raised by petitioner require more detailed analysis.

Petitioner claims that the guidelines represent an attempt to reduce disparities in sentences served by federal prisoners and thereby transform the parole commission into a "nationwide board of sentence review," and that there is no legislative authority for the commission to act in that capacity. In connection with this argu-

ment, petitioner claims that the guidelines infringe on the power of both the legislature and the judiciary. *Cf., Geraghty v. United States Board of Parole,* 579 F.2d 238, 254–55 (3d Cir. 1978), *vacated and remanded on other grounds sub nom United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980).

### C. Reducing Sentence Disparity

Petitioner traces the history of federal parole statutes and concludes that Congress consistently has determined that parole should be based on evaluations of institutional behavior and risks of recidivism. Petitioner argues that the guidelines operate as a "resentencing mechanism." But a review of the legislative history of the PCRA reveals that Congress did intend that the parole commission play a role in determining how much time an inmate should spend in prison:

From an historical perspective, parole originated as a form of clemency; to mitigate unusually harsh sentences, or to reward prison inmates for their exemplary behavior while incarcerated. Parole today, however, has taken a much broader goal in correctional policy, fulfilling different specific objectives of the correctional system. The sentences of nearly all offenders include minimum and maximum terms, ordinarily set by the sentencing court within a range of discretion provided by statute. *The final determination of precisely how much time an offender must serve is made by the parole authority.* The parole agency must weigh several complex factors in making its decision, not all or which are necessarily complementary. *In the first instance, parole has the practical effect of balancing differences in sentencing policies and*

---

**2.** For purposes of this order, I consider issues raised both in petitioner's original petition and in his brief submitted in support of his contention that summary judgment be granted in his favor.

**3.** In his petition, petitioner describes this study as one conducted for the Bureau of Prisons to determine what criteria were being used in re-

lease decisions under the Youth Corrections Act (18 U.S.C. §§ 5005–5026).

**4.** I note that petitioner does not claim that the parole commission did not follow proper procedures in establishing the guidelines. *See* 18 U.S.C. § 4218 (applicability of Administrative Procedure Act).

*practices between judges and courts in a system that is as wide and diverse as the Federal criminal justice system. In performing this function, the parole authority must have in mind some notion of the appropriate range of time for an offense which will satisfy the legitimate needs of society to hold the offender accountable for his own acts.*

H.Conf.R.No.94–838, 94th Cong., 2d Sess., *reprinted in* [1976] U.S.Code Cong. & Admin.News 335, 351–52. (Emphasis added.)

Thus, it is clear that Congress intended that the parole commission play a crucial role in the ultimate determination of how much time an inmate actually will serve before being released. This intent is made even more clear by the Conference Committee's discussion of § 4206 of the PCRA, which sets out the parole determination criteria:

It is the intent of the Conferees that the Parole Commission, in making each parole determination, shall recognize and make a determination as to the relative severity of the prospective parolee's offense and that in so doing shall be cognizant of the public perception of and respect for the law. It is the view of the Conferees that the U.S. Parole Commission is joined in purpose by the Courts, the Congress and the other Executive agencies in a continuing effort to instill respect for the law. The Parole Commission efforts in this regard are fundamental and shall be manifested by parole determinations which result in the release on parole of only those who meet the criteria of this Act.

Determinations of just punishment are part of the parole process, and these determinations cannot be easily made because they require an even-handed sense of justice. There is no body of competent empirical knowledge upon which parole decision-makers can rely, yet *it is important for the parole process to achieve an aura of fairness by basing determinations of just punishment on comparable periods of incarceration for similar offenses committed under similar circumstances.* The parole decision-makers must weigh the concepts of general and special deterrence, retribution and punishment, all of which are matters of judgment, and come up with determinations of what is meant by "would not depreciate the seriousness of his offense or promote disrespect for the law" that, to the extent possible, are not inconsistent with the findings in other parole decisions.

\* \* \* \* \* \*

Further, *this section provides that Parole Commission guidelines shall provide a fundamental gauge by which parole determinations are made.*

*Id.* at 358–59 [emphasis added].

Accordingly, I find that insofar as they attempt to reduce disparities among sentences and to establish "appropriate" lengths of incarceration for various kinds of offenses, the guidelines are in accord with the language and intent of the Parole Commission and Reorganization Act of 1976.[5]

---

5. In this regard, I note petitioner's reliance on the opinion of the Court of Appeals for the Third Circuit in *Geraghty v. United States Board of Parole, supra.* In that case the court questioned, without deciding, whether the guidelines complied with the intent of Congress. The court's main concern appeared to be whether the commission was infringing on the power and intent of the sentencing judge, an issue addressed *infra.* But to the extent that the language in *Geraghty* reflects concern about the attempt by the parole commission to reduce disparities in sentences, I disagree with the analysis by that court. I note further that while in *Geraghty* it expressed concerns tending to support the view that the guidelines are statutorily illegal in any context, the Court of Appeals for the Third Circuit did not take that view in a subsequent case, *Goldberg v. Warden, Allenwood Fed. Prison Camp,* 622 F.2d 60 (3d Cir. 1980). In *Goldberg,* the court stated:

In *Geraghty,* we suggested that a wooden application of parole guidelines to arrive at the parole determination could usurp traditional control over the sentencing process. In this case, however, there is no doubt that petitioner's parole determination took into account factors peculiar to him. The Commission took steps to insure that the sentencing judge's wishes were ascertained and complied with by forwarding an inquiry to the United States Attorney's office in Massachusetts. Only after the response was received did the Commission set parole. This con-

### D. Infringement on Powers of the Legislature

Petitioner suggests that in creating the guidelines, the parole commission may have usurped the power of the legislature, or that the legislature may have improperly delegated that power to the parole commission. The usurpation contention is without merit in light of the foregoing analysis of the intent of Congress when it passed the PCRA. In making his "delegation" argument, petitioner relies on the following language from the *Geraghty* opinion:

> Insofar as the Commission attempts to make general rules as to the appropriate punishment for crimes which effectively bind parole decisions in all cases, it undertakes functions which are usually discharged by the legislature.
>
> \*     \*     \*     \*     \*     \*
>
> Whether or not federal criminal penalties should be redrafted it is of dubious constitutional propriety to delegate so crucial a legislative function to a nonrepresentative body with no other standards other than a direction that the results "not depreciate the seriousness of the offense" and "be consistent with the public welfare." Accordingly, we decline to read such a delegation into the PCRA.

*Geraghty v. United States Parole Commission, supra,* 579 F.2d at 259, 263 (footnotes omitted).

On their face, the guidelines do not bind parole decisions in all cases. As noted earlier in this order, the commission regulations provide that parole decisions may be made outside the guidelines. 28 C.F.R. § 2.20(c). While it may be that most inmates are paroled within the time limits specified by the guidelines, that alone is not evidence that the commission is "bound by the guidelines in all cases." As discussed below, the court must decide in each case whether an inmate was given proper, personal parole consideration.

Petitioner's and the Third Circuit's concern about improper delegation of legislative authority stems apparently from the fact that the guidelines may not necessarily track statutory sentence lengths:

> It is clear that the "severity levels" in the parole guidelines do not correspond to the maximum punishments provided by Congress. While uttering a counterfeit note carries a statutory maximum of 15 years (18 U.S.C. § 472 (1970)), if the currency passed does not exceed $1,000, the Commission classes the offense as "low moderate." In contrast, mailing an anonymous threat to property, a violation whose statutory penalty is 2 years in jail (18 U.S.C. § 876 (1970)), is classified as "moderate" severity, requiring a longer sentence to be served before parole.
>
> Illegally selling alcohol in the vicinity of Indian schools (18 U.S.C. § 1154 (1970)) and violation of the Mann Act (18 U.S.C. § 2421 et seq. (1970)) are classified as "low moderate" and "high" severity crimes respectively, despite the fact that they carry identical 5 year penalties. Misprision of a felony, (18 U.S.C. § 4 (1970)) and extortion by a United States employee (18 U.S.C. § 872 (1970)) are each punishable by a maximum of 3 years imprisonment, yet the former is rated as a "moderately" severe crime, and the latter is determined to be of "very high" severity. Both carry lighter sentences than the Selective Service violations (50 App. U.S.C. § 462 (repealed) (5 year penalty)) which the Commission treats as "low moderate" severity.

*Id.* at 262, n. 115.

But an argument that the commission has "redrafted federal criminal penalties" misses the mark. Granted, the commission has broad discretion under the PCRA both in

---

crete example of considering factors peculiar to the particular prisoner negates any argument that petitioner received nothing more than a mechanical application of the parole guidelines. We therefore conclude that petitioner's parole determination complied with our dictates in *Geraghty*.

*Id.,* at 65. Thus, the case tending most strongly to support petitioner's position does not support the contention that the guidelines *per se* are illegal.

establishing guidelines and in making individual parole decisions. That discretion, however, is limited by the narrower confines of the penalties provided by statute and imposed by judges. In short, the parole commission never can determine that a prisoner will be held for a period longer than that specified by the sentencing judge. Indeed, it appears that the statute itself may constrain the commission to release on parole many prisoners who have not completed the full term imposed. *See* 18 U.S.C. § 4206(d) (1976). Thus, the guidelines do not represent an attempt to "redraft federal criminal penalties," and concern over possible delegation of that function is misplaced.

### E. Infringement on Powers of the Judiciary

Petitioner uses the following language from *Geraghty* to argue that in creating and employing the guidelines, the parole commission impinges on the power of the judiciary:

> To the extent that the Parole Commission makes individual judgments about the relative culpability of prisoners and the length of imprisonment proper to vindicate the needs of society yet fails to take account of the sentence imposed by the court, the Commission embarks, alone, on a task which is the traditional province of the judiciary.
>
> \*   \*   \*   \*   \*   \*
>
> When, however, the parole authority focuses consideration entirely on factors of

deterrence, incapacitation and retribution, it takes into account almost exclusively the very factors that are available to the sentencing judge. The Commission then begins to perform functions which are within the traditional province of the judiciary. At least where the prior determination of the judicial branch are given no weight, therefore, serious questions are raised whether the constitutional protections provided by an independent judiciary are being undermined. Since Congress has manifested no clear intention to raise such questions, we do not interpret the PCRA as authorizing such disregard of judicial sentences.

*Id.* at 259, 261 (footnotes omitted).

But the following analysis by the Court of Appeals for the Second Circuit describes more accurately the legal roles played by the legislature, the courts and the parole authority:

> ... we find no intrusion by the Commission upon legislative or judicial prerogatives. Congress specifies the maximum sentence and, on occasion, the minimum sentence. Within statutory limits the district court selects an appropriate sentence. Whether the defendant serves all or only some portion of that sentence is essentially a matter within the discretion of the Parole Commission.

*Moore v. Nelson,* 611 F.2d 434, 439 (2d Cir. 1979).[6]  *Priore v. Nelson,* 626 F.2d 211 (2d Cir. 1980).

---

**6.** In a recent opinion, the Supreme Court, in *dicta,* used similar language.

> Whether wisely or not, Congress has decided that the Commission is in the best position to determine when release is appropriate, and in doing so, to moderate the disparities in the sentencing practices of individual judges. The authority of sentencing judges to select precise release dates is, by contrast, narrowly limited: the judge may select an early parole eligibility date, but that guarantees only that the defendant will be considered at that time by the Parole Commission....
>
> The import of the statutory scheme is clear: the judge has no enforceable expectations with respect to the actual release of a sentenced defendant short of his statutory

term. The judge may well have expectations as to when release is likely. But the actual decision is not his to make, either at the time of sentencing or later if his expectations are not met. To require the Parole Commission to act in accordance with judicial expectations, and to use collateral attack [under 28 U.S.C. § 2255] as a mechanism for ensuring that those expectations are carried out, would substantially undermine the congressional decision to entrust release determinations to the Commission and not the courts. (footnotes omitted)

*United States v. Addonizio,* 442 U.S. 178, 188–90, 99 S.Ct. 2235, 2242–43, 60 L.Ed.2d 805 (1979).

*F. Fixed and Mechanical Decisionmaking*

In an argument that combines aspects of the preceding "infringement" contentions, petitioner asserts that the guidelines are illegal because they "rely on a mechanical predetermination of offense severity." In this regard, petitioner argues that the guidelines do not properly account for prisoners' institutional adjustment, and that reliance solely on severity of offense is not a valid reason for denial of parole.

### 1. Permissibility of Offense Severity Reason

As explained above, the PCRA expressly provides that the severity of offense is a proper ground for denial of parole. 18 U.S.C. § 4206 (1976). As noted by the Court of Appeals for this circuit: "Any doubts about the legality of basing future parole decisions on offense severity are dispelled by Congress' express sanction of the Parole Board's practice of basing decisions on this factor." *Garcia v. United States Board of Parole*, 557 F.2d 100, 107 (7th Cir. 1977). The legislative history of § 4206 also indicates the intent of Congress to include offense severity as a permissible reason for denying parole. *See* H.Cong.R.No.94–838, 94th Cong., 2d Sess., *reprinted in* [1976] U.S.Code Cong. & Admin.News 351, 358–59.

Petitioner's argument that the guidelines represent a "mechanical predetermination of offense severity" also must fail. While it is true that the guidelines establish categories for offenses, a particular prisoner is placed in a category only after consideration of the *individual* factors concerning his or her offense or risk on parole. I cannot find that the commission violated the PCRA simply because it established guidelines dealing expressly with offense severity. Of course, if prisoners could show that the commission simply placed them in categories without consideration of individual factors, a court might be able to find that the commission violated the PCRA. In the case at hand, petitioner makes no such claim.[7]

### 2. Failure to Assess Institutional Adjustment

One of the more difficult issues raised by petitioner is whether the guidelines adequately assess inmates' institutional behavior. The PCRA itself provides only that prisoners shall be paroled if, among other things, they have "substantially observed the rules of the institution or institutions to which [they have] been confined...." 18 U.S.C. § 4206(a) (1976). Commission regulations provide that "[t]he time ranges specified by the guidelines are established specifically for cases with good institutional adjustment and program progress." 28 C.F.R. § 2.20 (1976).

The legislative history of this section makes it clear that Congress intended that institutional behavior play a role in parole decisions:

First, it is the intent of the Conferees that the Parole Commission reach a judgment on the institutional behavior of each

---

**7.** It appears from the hearing summary in petitioner's case that at least the hearing panel assessed factors peculiar to his case:

This subject is certainly guilty of participating in a robbery which resulted in the death of an elderly physician. The subject would contest the fact that the physician's death was a direct result of the beating. He claims that the doctor died approximately two days after the robbery occurred and he claims that the doctor actually died because of strangulation or drowning from his own blood seeping from wounds in his throat and the broken jaw. Subject claims that he did not participate in the beating, that he was waiting in the car while it allegedly occurred. Of course, this would minimize the subject's culpability, however, it does not relieve him of the accountability.

The panel notices that the subject has a history of robberies and other assaultive behavior dating back to his youth. The subject would have the panel believe that these all were the result of his youthfulness and that he has outgrown that sort of behavior. The panel believes that this is a very serious offense and therefore believes that the subject should be held fully accountable and that he should spend some more time behind prison walls to satisfy that accountability. This is in no way depreciate [sic] the subject's good adjustment while incarcerated. No doubt, he has made an excellent adjustment with the only blemish, making a knife several years ago. In view of all the above, the panel makes the following recommendation.

prospective parolee. It is the view of the Conferees that understanding by the prisoner of the importance of institutional behavior is crucial to the maintenance of safe and orderly prisons.

Second, it is the intent of the Conferees that the Parole Commission review and consider both the nature and circumstances of the offense and the history and characteristics of the prisoner. It is the view of the Conferees that these two items are most significant in making equitable release determinations and are a viable basis, when considered together, for making other judgments required by [§ 4206].

H.Conf.Rep.No.94–838, 94th Cong., 2d Sess., *reprinted in* [1976] U.S.Code Cong. & Admin.News 351, 358.[8]

In addition, the report, in analyzing § 4207, pertaining to the information considered in the parole process, stated:

The relevance of material before the Commission is a determination committed to the agency's discretion. Moreover, this provision should not be construed as setting out priorities or assigning weights to the information before the Commission in the parole release process. *The Conferees are in complete agreement . . . that the weight assigned to individual factors (in parole decision-making) is solely within the province of the (commission's) broad discretion.*

*Id.* at 360 (emphasis added).

Thus, it appears that although Congress intends that the parole commission "reach a judgment on the institutional behavior of each prospective parolee" in order to determine whether he or she has "substantially observed the rules of the institution," the method for reaching that judgment, and the weight it must receive, rest with the commission's discretionary authority over the parole process. So long as the commission includes institutional adjustment in the process, it appears that the requirements of the PCRA have been met. As one court put it:

Satisfactory institutional performance is thus a prerequisite to release within the guidelines; deviation from the guidelines is appropriate in cases of especially good or especially bad institutional performance. The Commission must necessarily take institutional performance into consideration in applying the guidelines to a given case.

*Wilson v. U. S. Parole Commission*, 460 F.Supp. 73, 79 (D.Minn.1978).

In the case before the court, petitioner claims that the parole commission did not consider his excellent institutional behavior. But the summary prepared by the hearing panel indicates that it did consider petitioner's behavior. The panel noted that his "overall adjustment in the Canadian system was excellent," and that "[s]ince his arrival at Oxford, he has been placed in the Food Services Department and has received excellent work reports from that area." The weight to be given this factor, however, rests with the commission. There is nothing improper about the commission's decision to deny parole despite good institutional adjustment. *See Izsak v. Sigler*, 604 F.2d 1205, 1207 (9th Cir. 1979).

## II. THE GUIDELINES AND SENTENCES IMPOSED UNDER 18 U.S.C. § 4205(b)(2)

Petitioner is serving his Canadian sentence in the United States pursuant to a treaty on prisoner exchange agreed to by both countries. Congress provided that:

An offender transferred to the United States to serve a sentence of imprisonment may be released on parole at such

---

8. The Court of Appeals for the Seventh Circuit has commented on the commission's assessment of institutional behavior: Whether the commission's "criteria" establishing continued good behavior as a prerequisite to parole release is adequate in light of this expression of intent may be subject to some doubt; for presumably behavior less than "extraordinary" should also be considered in reaching a judgment on whether the guidelines ought to be dispositive. The answer to that question, however, must await another day . . . .

*Rodriquez v. United States Parole Com'n*, 594 F.2d 170, 173 (7th Cir. 1979).

time as the Parole Commission may determine.

18 U.S.C. § 4106(c) (Supp. I, 1977).

Petitioner contends that this subsection provides that petitioner should be treated in a manner identical to persons sentenced under 18 U.S.C. § 4205(b)(2):

> Upon entering a judgment of conviction, the court having jurisdiction to impose sentence, when in its opinion the ends of justice and best interest of the public require that the defendant be sentenced to imprisonment for a term exceeding one year, ... (2) the court may fix the maximum sentence of imprisonment to be served in which event the court may specify that the prisoner may be released on parole at such time as the Commission may determine.

Petitioner argues that for purposes of this action, he should be treated as having been sentenced under 18 U.S.C. § 4205(b)(2) (formerly 18 U.S.C. § 4208(a)(2) (1970 ed.)) (hereinafter sometimes referred to as (b)(2)). I accept that argument for purposes of this order.

According to petitioner, prisoners serving time under a (b)(2) sentence are entitled to unique parole consideration which includes analysis of their institutional performance and progress. Because they do not take into account these institutional factors, petitioner argues, the guidelines cannot lawfully be applied to prisoners serving (b)(2) sentences.

Because I have decided that the commission is free to take into account the seriousness of the offense, and to base a parole decision solely on that criterion, and because I have decided that the commission guidelines adequately assess institutional adjustment, the only issue left with respect to a (b)(2) sentence is whether the commission must apply different criteria to prisoners serving those sentences.

Three main alternatives are available to judges at the time of sentencing. Judges may impose sentences which set the parole eligibility date at the one-third point of the term (18 U.S.C. § 4205(a) (1976)); they may designate a minimum period of time, up to the one-third point of the term, convicted persons must serve before they are eligible for parole (18 U.S.C. § 4205(b)(1) (1976)); or judges may impose sentences that provide for immediate parole eligibility (18 U.S.C. § 4205(b)(2)).

In support of his claim that the guidelines may not be applied to prisoners serving (b)(2) sentences, petitioner argues that "[i]f a (b)(2) prisoner must serve the same 'customary length of imprisonment' as is required of a prisoner serving a regular adult sentence, then the two sentences are, in fact, of equal severity, a result contrary [to interpretations of this statutory provision]." Petitioner argues also that the (b)(2) sentence provision requires that the parole commission afford unique consideration of a prisoner's institutional adjustment.

It may well have been that prior to the passage of the PCRA of 1976, the (b)(2) sentence did require special parole consideration, and some of the cases cited by petitioner tend to support that view.[9] But prior to 1976, there was no express statutory authority for the parole commission to create any guidelines. Therefore, it is necessary to reconsider the (b)(2) provision in light of the PCRA of 1976 and its express authorization for the parole commission to create guidelines for parole decisions. 18 U.S.C. § 4203(a)(1) (1976).

The Act requires that release of prisoners eligible for parole be "pursuant to guidelines promulgated by the Commission pursuant to section 4202(a)(1)...." 18 U.S.C. § 4206(a)(2) (1976). Nothing in the text of the PCRA requires the commission to apply unique standards to consideration of parole for prisoners serving (b)(2) sentences.

**9.** These cases dealt with Pub.L.No.85–752, § 3, 72 Stat. 845 (1958), 18 U.S.C. § 4208(a)(2) (1970). This provision authorized the court to specify that a prisoner may "become eligible for parole" at the time the Parole Board may determine. The present version of this section,

18 U.S.C. § 4205(b)(2) (1976), authorizes the court to specify that the prisoner may "be released on" parole at the time the parole commission may determine. The change in language is not significant, at least for purposes of this order.

Nothing in the legislative history of the Act indicates that Congress intended that prisoners serving (b)(2) sentences be treated differently from prisoners sentenced under other statutory provision. The Senate report noted:

> The only notable change [in the standards for release on parole] is that the standards and criteria are made the same for all federal prisoners without regard to which of the three main sentencing alternatives is utilized by the court. This will be of significant benefit to the federal correctional institutions because offenders sentenced for similar crimes under similar circumstances will be required to serve comparable periods of incarceration.

S.Rep.No.94–369, 94th Cong., 1st Sess. (1975), *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 335, 339–40.[10]

As noted earlier in this opinion, the Conference Report on the PCRA stated that "Parole Commission guidelines shall provide a fundamental gauge by which parole determinations are made." H.Conf.Rep.No. 94–838, 94th Cong., 2d Sess., *reprinted in* [1976] U.S.Code Cong. & Admin.News 351, 359. In addition, the Conference Report noted that § 4206 "permits the Commission to grant or deny parole notwithstanding the guidelines only when the Commission has determined that there is good cause to do so." *Id.* Nothing in the Conference Report indicates special consideration for prisoners serving sentences imposed under 18 U.S.C. § 4205(b)(2) (1976).

Other courts analyzing the PCRA agree that no special parole consideration be given prisoners serving (b)(2) sentences. For example, the Court of Appeals for the Seventh Circuit stated that:

> Even if [§ 4205(b)(2)] requires special review hearings for indeterminate sentences, it does not require that prisoners sentenced under that statute be considered for parole under any different

criteria than other prisoners... The existence of a serious criminal background is clearly a proper basis for parole denial....

*Christopher v. U. S. Bd. of Parole*, 589 F.2d 924, 932 (7th Cir. 1978) (citations omitted). *See also Moore v. Nelson*, 611 F.2d 434, 437–38 (2d Cir. 1979); *Shahid v. Crawford*, 599 F.2d 666, 668–70 (5th Cir. 1979); *Albano v. Anderson*, 472 F.Supp. 931, 935–36 (M.D. Pa.1979).

The commission may lawfully apply the guidelines to prisoners serving (b)(2) sentences.

### III. PETITIONER'S PAROLE HEARING

Petitioner claims that the parole commission violated his constitutional and statutory rights when it: gave him inadequate notice of his parole hearing; designated his case as "original jurisdiction"; gave him an inadequate statement of reasons for denial of parole; failed to disclose a postsentence report used in the parole process; and failed to turn over records of his parole hearing in time for petitioner to prepare an administrative appeal.

#### A. Notice of Hearing

Petitioner alleges that "on or about December 2, 1978, the petitioner was served with a "Notice of Hearing" which simply stated that he would meet with the commission for his parole application "in the month of January, 1979." Petitioner claims that this notice violated his right to due process of law. Respondent argues that there is no inherent constitutional right to due process in parole determinations, and that the federal parole statute does not create an entitlement which gives rise to constitutional rights. *Cf., Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979).

---

**10.** Petitioner states that the quoted "material is from the Senate report on the senate bill, which was not passed. The language of the senate report was nowhere adopted in the House Conference Report...." While the precise language of the Senate Report was not incorporated in the Conference Report, the language quoted above does reflect the nature of the Act. Nothing in the Conference Report leads to a different interpretation.

Since the notice actually given petitioner is not properly part of the record in this case, I cannot reach the issue of its adequacy. I note, however, that if petitioner's allegations are accurate, it would appear that the notice was inadequate under 18 U.S.C. § 4208(b), which provides:

At least thirty days prior to any parole determination proceeding, the prisoner shall be provided with (1) written notice of the time and place of the proceeding.... [11]

In addition, 18 U.S.C. § 4208(d)(2) gives inmates the right to be represented at parole hearings, and the commission may not exclude all lawyers as potential representatives. Petitioner claims that the notice allegedly given in this case made it impossible for him to retain counsel for his parole hearing. With further development of the record, it is possible that petitioner will be able to sustain that claim. At this point, however, it is unclear what relief could be granted.

Respondent argues that:

The Commission notifies a prisoner at least sixty days in advance of his hearing (thirty days at the time of petitioner's hearing) of the precise dates between which the Commission's hearing examiners will be holding hearings at the institution where the prisoner is confined.

Respondent points out that this time period " 'does not normally exceed one or two weeks,' " and asserts that:

We believe the Commission's practice of affording notice is based on a reasonable interpretation of its own enabling statute and its extensive experience in conducting institutional parole hearings, consequently it should be accorded great deference by the Court.

However, there is no need to pay "great deference" to an agency interpretation of a statute where that interpretation may effectively negate another part of the statute. There arise grave doubts regarding the statutory validity of its actions if the commission follows a practice of giving notice that does in fact make it unreasonably difficult for inmates to retain representatives for parole hearings.

### B. Original Jurisdiction Designation

■ Under Commission regulations, certain cases are designated as "original jurisdiction" and decisions are rendered by the national commissioners. 28 C.F.R. § 2.17. Because petitioner is serving a life sentence, his case was so designated. 28 C.F.R. § 2.17(b)(4). Petitioner claims that the referral of his case for an original jurisdiction decision violated his rights to due process of law. But such a referral does not implicate any constitutional or statutory rights. "The original jurisdiction referral ... does not affect the prisoner's chances for parole but merely requires that the decision be made by the [commission] members rather than by hearing examiners." *Christopher v. U. S. Bd. of Parole, supra,* 589 F.2d at 932. *See also Butson v. Chairman, U. S. Parole Com'n,* 457 F.Supp. 841, 845 (D.Col. 1978) (no constitutional right to appear before voting members of the parole commission).

---

11. Section 4208(b) provides also that:

A prisoner may waive such notice, except that if notice is not waived, the proceeding shall be held during the next regularly scheduled proceedings by the Commission at the institution in which the prisoner is confined. This language may make it appear that the commission is free to ignore the notice provisions of the statute, but the legislative history makes it clear that such was not the intent of Congress:

Notice of pending release proceedings and access to information considered by the Commission in such proceedings must be given to the inmate at least 30 days prior thereto. Where an inmate has just arrived at the institution, however, it may be impossible to meet this time period. Provision is made therefore for waiver, at the inmate's option, of the time requirement. But, if an inmate refuses to waive notice, the Commission is under no duty to schedule special sessions to make up for such proceedings, although they may. In such cases, the inmate shall be heard by the Commission at the next regularly scheduled parole proceedings at that institution.

H.Conf.Rep.No.94–838, 94th Cong., 2d Sess., *reprinted in* [1976] U.S.Code Cong. & Admin. News 351, 361.

### C. Statement of Reasons for Denial of Parole

The parole commission gave the following reasons for its denial of parole and imposition of a four-year continuance in petitioner's case:

Your offense behavior has been rated as Greatest II severity because you participated in a robbery which resulted in the death of a person as a result of a beating. You have a salient factor score of 5. You have been in custody a total of 106 months. Guidelines established by the Commission for adult cases which consider the above factors indicate a range of 85 or more months to be served before release for cases with good institutional program performance and adjustment. After review of all relevant factors and information presented, it is found that your release at this time would depreciate the seriousness of your offense behavior. Commission guidelines for Greatest II severity cases do not specify a maximum limit. Therefore, the decision in your case is based in part upon a comparison of the relative severity of your offense behavior with the offense behaviors and time ranges specified in the Greatest I severity category. As required by law, you have also been scheduled for a statutory interim hearing during January, 1981.

Petitioner makes several arguments regarding both the statement of reasons and the decision itself. He claims that as a result of the decision, he will be forced to serve nearly twice the minimum time recommended by the guidelines. This decision, according to petitioner, is "arbitrary and founded upon insufficient and illegal reasons." In addition, petitioner argues that "[a]side from the explanation of the purely mechanical functioning of the 'guidelines'

there is no reason for the petitioner's four-year continuance other than 'your release at this time would depreciate the seriousness of your offense behavior.' "

Central to petitioner's argument is that the offense severity rating already takes into account the seriousness of the offense, and that the salient factor score already accounts for petitioner's prior record:

To count these factors as reasons to double up on the minimum time [petitioner] must serve makes nonsense of the idea that those factors were to be used to compute the minimum in the first place. The effect of the commission's action is so excessive, harsh and severe that the result is the same as placing [petitioner] above the guidelines, even though no maximum applies to him.

Thus, petitioner's argument seems to be that the commission may not lawfully consider offense severity both in computing its guidelines and as a reason for denying parole and for imposing a four-year continuance for a reconsideration hearing.[12] However, for reasons discussed below, none of petitioner's arguments can succeed.

### 1. Due Process and Statement of Reasons

■ Because there is no inherent constitutional protection in parole determination proceedings, *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668, courts must look first to the underlying parole statute to determine what role, if any, constitutional protections play in the parole process. It is an open question whether the federal parole statute creates a liberty interest sufficient to require due process protection. *See Shahid v. Crawford*, 599 F.2d at 670, n.5. In the case at hand, however, it is not necessary to

---

12. Petitioner is not claiming that he did not understand the statement of reasons because it did not explain either the salient factor score or the offense severity rating. *See e. g., Monks v. United States Parole Com'n*, 463 F.Supp. 859, 866 (M.D.Pa.1978).

In addition, petitioner is not claiming that the four-year continuance violated 18 U.S.C. § 4208(h)(2), which requires a parole hearing

every two years "in the case of a prisoner with a term or terms of seven years or longer." The commission did inform petitioner that he would receive such a hearing. Of course, any argument that the "statutory interim hearing" did not constitute meaningful parole consideration would be premature before such a hearing was actually held.

decide the question because the parole commission's statement of reasons complied with standards of due process established by the Supreme Court in *Greenholtz* and by the Court of Appeals for the Seventh Circuit in various other cases. *See, e. g., Bowles v. Tennant*, 613 F.2d 776 (9th Cir. 1980).

In *Greenholtz*, a majority of the Court held that the "unique structure and language" of the Nebraska parole statute provided an expectation of parole sufficient to create a liberty interest "entitled to some measure of constitutional protection." *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. at 12, 99 S.Ct. at 2106. The Court held that the constitution does not require the Nebraska parole authority to provide a summary of the evidence relied upon in making the parole determination.

> The Nebraska procedure affords an opportunity to be heard, and when parole is denied it informs the inmate in what respects he falls short of qualifying for parole; this affords the process that is due under these circumstances. The Constitution does not require more.

*Id.*, at 16, 99 S.Ct. at 2108. Thus, it appears that the Court held that a statement of reasons for denial of parole satisfies due process requirements. The Court did not consider what would constitute an adequate statement of reasons, but that issue has been addressed by the Court of Appeals for the Seventh Circuit.

Prior to *Greenholtz*, the court of appeals held that parole determination proceedings must meet minimum requirements of due process. *United States ex rel. Richerson v. Wolff*, 525 F.2d 797 (7th Cir. 1975), *cert. denied*, 425 U.S. 914, 96 S.Ct. 1511, 47 L.Ed.2d 764 (1976):

> "[Statements of reasons for denying parole] should be sufficient to enable a reviewing body to determine whether parole has been denied for an impermissible reason or for no reason at all. For this essential purpose, detailed findings of fact are not required, provided the

Board's decision is based upon consideration of all relevant factors and it furnishes to the inmate both the grounds for the decision . . . and the essential facts upon which the Board's inferences are made . . . ."

525 F.2d at 804, *quoting United States ex rel. Johnson v. Chairman of New York State Board of Parole*, 500 F.2d 925 (2d Cir.), *vacated as moot*, 419 U.S. 1015, 95 S.Ct. 488, 42 L.Ed.2d 289 (1974).

In *Garcia v. United States Bd. of Parole*, 557 F.2d 100 (7th Cir. 1977), the court upheld the following statement of reasons for denial of parole:

> "Your offense behavior has been rated as greatest severity because your offense involved the detonation of explosives during the bombing of several business establishments in Chicago, Illinois. You have a Salient Factor Score of eleven. You have been in custody a total of twenty-eight months. Guidelines established by the Board for adult cases which consider the above factors indicate a range of more than thirty-six months to be served before release for cases with good institutional program performance and adjustment. After review of all relevant factors and information presented, it is found that a decision at this consideration outside the guidelines does not appear warranted. Board guidelines for greatest severity cases do not specify a maximum limit. Therefore, the decision in your case has been based in part upon a comparison of the relative severity of your offense behavior with offense behavior examples listed in the very high severity category."

*Id.* at 103. The court found that the statement met the *Richerson* standard:

> [T]he statement adequately informed Garcia of the "grounds for the decision and the essential facts upon which the Board's inferences are based," and enabled a reviewing body to determine whether parole was denied for an impermissible reason. The statement clearly

points out that, despite Garcia's maximum Salient Factor Score and his good institutional record, the Board decided to rely on its guidelines and deny Garcia parole. To require a more detailed finding would be to require the Board to issue an opinion supporting its decision, rather than a mere statement of reasons for its action. As we said in *Richerson*," "No reason need be given to explain [the] reasons [set forth]."

*Id.* at 105 (citation omitted).

■ The statement of reasons given petitioner in the case at hand meets the minimal requirements of due process established in *Richerson* and followed in *Garcia*.[13] The commission told petitioner that the severity of his offense—he "participated in a robbery which resulted in the death of a person as a result of a beating"—precluded release at the time of his parole hearing because release then "would depreciate the seriousness of [his] offense behavior." This statement informed petitioner of the grounds for the decision (offense severity and depreciation of its seriousness) and the essential facts upon which the decision was based (robbery and resultant death of a person by beating). These statements, minimal though they be, are enough to allow a court to determine whether parole was denied for an "impermissible reason or for no reason at all."

■ In addition, petitioner appears to claim that the statement of reasons was an inadequate explanation of the decision to give him a four-year continuance. But nothing requires the commission to distinguish between parole denial and length of continuance when it explains its decisions. Therefore, the statement of reasons in this case covers adequately both the denial of parole and the four-year continuance.

### 2. *Statutory Validity of Reasons*

■ As noted earlier in this opinion, the PCRA expressly authorizes the parole commission to base decisions on the severity of a prisoner's offense. 18 U.S.C. § 4206(a) (1976). It follows that a statement of reasons indicating that offense severity, including an explanation of the commission's assessment of the severity, meets the statutory requirement that prisoners be given the reasons for denial of parole. 18 U.S.C. § 4206(b) (1976).

### 3. *"Double-counting" Offense Severity and Prior Record*

Petitioner also claims that the parole commission improperly counted his prior record and offense severity twice in arriving at the parole decision. According to petitioner, this double-counting occurred when the commission created the guidelines and then used them in the denial of parole. This argument is without merit. The guidelines serve as a basis for determining whether to grant or deny parole. If the commission chooses to rely on the guidelines to reach a parole decision, it is not "double-counting" offense severity or prior record.

■ In connection with this argument, petitioner claims that the commission's decision to require him to serve nearly twice the minimum provided by the guidelines effectively places him above the guidelines. The guidelines, however, specify no maximum for petitioner. In this case, there is nothing improper about the fact that the guidelines do not provide a maximum.

### D. *Failure to Disclose Postsentence Report*

According to petitioner, the parole commission failed to provide him access to a postsentence report prepared by authorities in the United States nine years after commission of the crime for which petitioner was convicted. Petitioner claims that this

---

**13.** Petitioner attempts to distinguish *Garcia* on the ground that Garcia had not yet served the minimum time provided by the guidelines. That distinction, however, does not affect the standard that the parole commission must meet when providing a statement of reasons for a parole decision. The PCRA does require a more extensive statement for a parole decision *outside* the guidelines. 18 U.S.C. § 4206(c) (1976). But no such decision was made in petitioner's case.

report contained an inaccurate description of the circumstances of the crime. The panel presiding at petitioner's parole hearing stated in its hearing summary:

> Please notice that there is a difference of a description of the offense between the description in the report from the Canadian authority and the Postsentence report [prepared by authorities in the United States], but it appears that the subject and two other individuals were involved together in robbing an elderly physician who had his office in conjunction with his home. It appears that at least two of the co-defendants entered the home and beat the physician very severely trying to get him to reveal his hiding place for his money. They left him beaten to the floor and went to the car for a few minutes and then all three of them, including the subject, turned [sic] to the house where they continued the commission of the robbery. However, subject claims that they never found any money, therefore, the robbery did not occur.

Petitioner correctly points out that this statement does not indicate that the hearing panel resolved the factual discrepancies.

Respondent apparently believes that petitioner claims that he did not see the report prepared by the *Canadian* authorities. Respondent argues that petitioner had a chance to see that report after the hearing and to address any complaints regarding it to the parole commission when he appealed. Respondent argues that "[I]t is apparent from the record that the Commission determined that a four-year continuance was justifiable even assuming petitioner's version of the facts to be true."

█ The issue regarding failure to disclose the report cannot be decided without further factual development. At the least, the parties should present evidence establishing exactly which report petitioner could not review before his hearing and whether he had a chance to review the report before taking his administrative appeal. I note,

however, that a simple failure or refusal to turn over a report would constitute a violation of 18 U.S.C. § 4208(b) (1976).

## E. Appeal

█ Petitioner claims that the parole commission violated his right to due process because it failed to release in a timely fashion the tape recording and hearing summary of his parole hearing. Specifically, petitioner claims that he was not given a copy of the recording and written summary of the hearing until after the filing deadline for his administrative appeal had passed.

The PCRA provides that inmates shall have a right to "such record as the Commission may retain of the proceeding." 18 U.S.C. § 4208(f) (1976). Petitioner also claims that federal regulations under the Privacy Act require that requests for records be met within forty business days, and that the commission failed to meet that deadline.

Respondent apparently concedes that the commission was late in disclosing the record of the hearing, but argues

> Petitioner had ample time to include in his June 1, 1979 addendum [to his administrative appeal] the fruits of his research of those materials since the tape and summary were sent to him on April 16, 1979. Since petitioner cannot show prejudice from these alleged wrongs, he cannot obtain habeas corpus relief.

From the record in this case, it appears that petitioner did have an opportunity to review the record of his hearing before he submitted his addendum dated June 1, 1979. But without a showing that the addendum was or was not considered by the reviewing body, I cannot determine whether petitioner can demonstrate prejudice by the delay in turning over the record. Petitioner claims that he asked for an extension of time in which to prepare his appeal, but the record does not reflect whether the request was granted. However, I note that the national commissioners sent their notice to

petitioner on June 22, 1979, and thus, there may well have been an opportunity for them to consider the addendum sent on June 1. If the commissioners did receive and consider the addendum before reaching a decision on petitioner's appeal, he would be unable to show prejudice resulting from the untimely release of his record. *See Payton v. Thomas*, 486 F.Supp. 64, 67 (S.D. N.Y.1980); *Butson v. Chairman, U. S. Parole Com'n*, 457 F.Supp. at 844.

### ORDER

For the reasons stated above, IT IS ORDERED that respondent's motion for summary judgment is DENIED with respect to petitioner's claims that he

1) received inadequate notice of the date of his parole hearing;

2) was not provided with an opportunity to review a report on which the parole commission relied in making its decision; and

3) was prejudiced by the delay in turning over the record of his parole hearing.

In all other respects, respondent's motion for summary judgment is GRANTED.

Disposition of the petition for a writ of habeas corpus will be deferred to allow further development of the record. Petitioner may have until March 16, 1981, in which to submit any material or arguments relevant to his remaining claims. Respondent may have until March 23, 1981, to respond to petitioner's submission.

# APPENDIX

**Title 28—Judicial Administration**

ADULT GUIDELINES FOR PAROLE DECISIONMAKING

| Offense characteristics-severity of offense behavior (examples) | Offender characteristics-parole prognosis (salient factor score) | | | |
|---|---|---|---|---|
| | Very good (11-9) | Good (8-6) | Fair (5-4) | Poor (3-0) |
| **Low** | | | | |
| Alcohol or cigarette law violations, including tax evasion (amount of tax evaded less than $2,000) [1]. | | | | |
| Gambling law violations (no managerial or proprietary interest) ...... | | | | |
| Illicit drugs, simple possession ...................... | 6 mo ............... | 6 to 9 mo ....... | 9 to 12 mo ..... | 12 to 16 mo. |
| Marihuana/hashish, possession with intent to distribute/sale [very small scale (e.g., less than 10 lbs. of marihuana/less than 1 lb. of hashish/less than .01 liter of hash oil)]. | | | | |
| Property offenses (theft, income tax evasion, or simple possession of stolen property) less than $2,000. | | | | |
| **Low Moderate** | | | | |
| Counterfeit currency or other medium of exchange [(passing/possession) less than $2,000]. | | | | |
| Drugs (other than specifically categorized), possession with intent to distribute/sale [very small scale (e.g., less than 200 doses)]. | | | | |
| Marihuana/hashish, possession with intent to distribute/sale [small scale (e.g., 10-49 lbs. of marihuana/1-4.9 lbs. hashish/.01-.04 liters of hash oil)]. | | | | |
| Cocaine, possession with intent to distribute/sale [very small scale (e.g., less than 1 gram of 100% purity, or equivalent amount)]. | 8 mo ............... | 8 to 12 mo ..... | 12 to 16 mo... | 16 to 22 mo. |
| Gambling law violations—managerial or proprietary interest in small scale operation [e.g., Sports books (estimated daily gross less than $5,000); Horse books (estimated daily gross less than $1,500); Numbers bankers (estimated daily gross less than $750)]. | | | | |
| Immigration law violations ...................................... | | | | |
| Property offenses (forgery/fraud/theft from mail/embezzlement/interstate transportation of stolen or forged securities/receiving stolen property with intent to resell) less than $2,000. | | | | |
| **Moderate** | | | | |
| Automobile theft (3 cars or less involved and total value does not exceed $19,999) [2]. | | | | |
| Counterfeit currency or other medium of exchange [(passing/possession) $2,000-$19,999]. | | | | |
| Drugs (other than specifically categorized), possession with intent to distribute/sale [small scale (e.g., 200-999 doses)]. | | | | |
| Marihuana/hashish, possession with intent to distribute/sale [medium scale (e.g., 50-199 lbs. of marihuana/5-19.9 lbs. of hashish/.05-.19 liters of hash oil)]. | | | | |
| Cocaine, possession with intent to distribute/sale [small scale (e.g., 1.0-4.9 grams of 100% purity, or equivalent amount)]. | | | | |
| Opiates, possession with intent to distribute/sale [evidence of opiate addiction and very small scale (e.g., less than 1.0 grams of 100% pure heroin, or equivalent amount)]. | 10 to 14 mo... | 14 to 18 mo... | 18 to 24 mo... | 24 to 32 mo. |
| Firearms Act, possession/purchase/sale (single weapon: not sawed-off shotgun or machine gun). | | | | |
| Gambling law violations—managerial or proprietary interest in medium scale operation [e.g., Sports books (estimated daily gross $5,000-$15,000); Horse books (estimated daily gross $1,500-$4,000); Numbers bankers (estimated daily gross $750-$2,000)]. | | | | |
| Property offenses (theft/forgery/fraud/embezzlement/interstate transportation of stolen or forged securities/income tax evasion/receiving stolen property) $2,000-$19,999. | | | | |
| Smuggling/transporting of alien(s) ...................................... | | | | |

See footnotes at end of table.

**Chapter I—Department of Justice**

ADULT GUIDELINES FOR PAROLE DECISIONMAKING—Continued

| Offense characteristics-severity of offense behavior (examples) | Offender characteristics-parole prognosis (salient factor score) | | | |
| --- | --- | --- | --- | --- |
| | Very good (11–9) | Good (8–6) | Fair (5–4) | Poor (3–0) |
| **High** | | | | |
| Carnal knowledge [3] | | | | |
| Counterfeit currency or other medium of exchange [(passing/possession) $20,000-$100,000]. | | | | |
| Counterfeiting [manufacturing (amount of counterfeit currency or other medium of exchange involved not exceeding $100,000)]. | | | | |
| Drugs (other than specifically listed), possession with intent to distribute/sale [medium scale (e.g., 1,000–19,999 doses)]. | | | | |
| Marihuana/hashish, possession with intent to distribute/sale [large scale (e.g., 200–1,999 lbs. of marihuana/20–199 lbs. of hashish/.20–1.99 liters of hash oil)]. | | | | |
| Cocaine, possession with intent to distribute/sale [medium scale (e.g., 5–99 grams of 100% purity, or equivalent amount)]. | | | | |
| Opiates, possession with intent to distribute/sale [small scale (e.g., less than 5 grams of 100% pure heroin, or equivalent amount) except as described in moderate]. | 14 to 20 mo... | 20 to 26 mo... | 26 to 34 mo... | 34 to 44 mo. |
| Firearms Act, possession/purchase/sale (sawed-off shotgun(s), machine gun(s), or multiple weapons). | | | | |
| Gambling law violations—managerial or proprietary interest in large scale operation [e.g., Sports books (estimated daily gross more than $15,000); Horse books (estimated daily gross more than $4,000); Numbers bankers (estimated daily gross more than $2,000)]. | | | | |
| Involuntary manslaughter (e.g., negligent homicide) | | | | |
| Mann Act (no force—commercial purposes) | | | | |
| Property offenses (theft/forgery/fraud/embezzlement/interstate transportation of stolen or forged securities/income tax evasion/receiving stolen property) $20,000–$100,000. | | | | |
| Threatening communications (e.g., mail/phone)—not for purposes of extortion and no other overt act. | | | | |
| **Very High** | | | | |
| Robbery—(1 or 2 instances) | | | | |
| Breaking and entering—armory with intent to steal weapons | | | | |
| Breaking and entering/burglary—residence; or breaking and entering of other premises with hostile confrontation with victim. | | | | |
| Counterfeit currency or other medium of exchange [(passing/possession)—more than $100,000 but not exceeding $500,000]. | | | | |
| Drugs (other than specifically listed), possession with intent to distribute/sale [large scale (e.g., 20,000 or more doses) except as described in Greatest I]. | | | | |
| Marihuana/hashish, possession with intent to distribute/sale [very large scale (e.g., 2,000 lbs. or more of marihuana/200 lbs. or more of hashish/2 liters or more of hash oil)]. | 24 to 36 mo... | 36 to 48 mo... | 48 to 60 mo... | 60 to 72 mo. |
| Cocaine, possession with intent to distribute/sale [large scale (e.g., 100 grams or more of 100% purity, or equivalent amount) except as described in Greatest I]. | | | | |
| Opiates, possession with intent to distribute/sale [medium scale or more (e.g., 5 grams or more of 100% pure heroin, or equivalent amount) except as described in Greatest I]. | | | | |
| Extortion [threat of physical harm (to person or property)] | | | | |
| Explosives, possession/transportation | | | | |
| Property offenses (theft/forgery/fraud/embezzlement/interstate transportation of stolen or forged securities/income tax evasion/receiving stolen property) more than $100,000 but not exceeding $500,000. | | | | |
| **Greatest I** | | | | |
| Aggravated felony (e.g., robbery: weapon fired or injury of a type normally requiring medical attention). | | | | |

See footnotes at end of table.

ADULT GUIDELINES FOR PAROLE DECISIONMAKING—Continued

| Offense characteristics-severity of offense behavior (examples) | Offender characteristics-parole prognosis (salient factor score) | | | |
|---|---|---|---|---|
| | Very good (11–9) | Good (8–6) | Fair (5–4) | Poor (3–0) |
| Arson or explosive detonation [involving potential risk of physical injury to person(s) (e.g., premises occupied or likely to be occupied)—no serious injury occurred]. Drugs (other then specifically listed), possession with intent to distribute/sale [managerial or proprietary interest and very large scale (e.g., offense involving more than 200,000 doses)]. Cocaine, possession with intent to distribute/sale [managerial or proprietary interest and very large scale (e.g., offense involving more than 1 kilogram of 100% purity, or equivalent amount)]. Opiates, possession with intent to distribute/sale [managerial or proprietary interest and very large scale (e.g., offense involving more than 50 grams of 100% pure heroin, or equivalent amount)]. Kidnaping [other than listed in Greatest II, limited duration; and no harm to victim (e.g., kidnaping the driver of a truck during a hijacking, driving him to a secluded location, and releasing victim unharmed)]. Robbery (3 or 4 instances) ................................................ Sex act—force [e.g., forcible rape or Mann Act (force)]................ Voluntary manslaughter (unlawful killing of a human being without malice; sudden quarrel or heat of passion). | 40 to 52 mo... | 52 to 64 mo... | 64 to 78 mo | 78 to 100 mo. |
| **Greatest II** Murder: ................................................................................... Aggravated felony—serious injury (e.g., robbery; injury involving substantial risk of death, or protracted disability, or disfigurement) or extreme cruelty/brutality toward victim. Aircraft hijacking................................................................... Espionage ............................................................................ Kidnaping (for ransom or terrorism; as hostage; or harm to victim) Treason ............................................................................... | 52 + mo .......... | 64 + mo .......... | 78 + mo .......... | 100 + mo. Specific upper limits are not provided due to the limited number of cases and the extreme variation possible within category. |

YOUTH/NARA GUIDELINES FOR DECISIONMAKING

| | | | | |
|---|---|---|---|---|
| **Low** Alcohol or cigarette law violations, including tax evasion (amount of tax evaded less than $2,000) [1]. Gambling law violations (no managerial or proprietary interest)...... Illicit drugs, simple possession .......................................... Marihuana/hashish, possession with intent to distribute/sale [very small scale (e.g., less than 10 lbs. of marihuana/less than 1 lb. of hashish/less than .01 liter of hash oil)]. Property offenses (theft, income tax evasion, or simple possession of stolen property) less than $2,000. | 6 mo............... | 6 to 9 mo....... | 9 to 12 mo..... | 12 to 16 mo. |
| **Low Moderate** Counterfeit currency or other medium of exchange [(passing/ possession) less than $2,000]. Drugs (other than specifically categorized), possession with intent to distribute/sale [very small scale (e.g., less than 200 doses)]. Marihuana/hashish, possession with intent to distribute/sale [small scale (e.g., 10–49 lbs. of marihuana/1–4.9 lbs. hashish/ .01–.04 liters of hash oil)]. Cocaine, possession with intent to distribute/sale [very small scale (e.g., less than 1 gram of 100% purity, or equivalent amount)]. Gambling law violations—managerial or proprietary interest in small scale operation [e.g., Sports books (estimated daily gross less than $5,000; Horse books (estimated daily gross less than $1,500); Numbers bankers (estimated daily gross less than $750)]. Immigration law violations ................................................... Property offenses (forgery/fraud/theft from mail/embezzlement/ interstate transportation of stolen or forged securities/receiving stolen property with intent to resell) less than $2,000. | 8 mo............... | 8 to 12 mo....... | 12 to 16 mo... | 16 to 20 mo. |

See footnotes at end of table.

## Chapter I—Department of Justice §2.20

YOUTH/NARA GUIDELINES FOR DECISIONMAKING—Continued

**Moderate:**

Automobile theft (3 cars or less involved and total value does not exceed $19,999)[2].

Counterfeit currency or other medium of exchange [(passing/possession) $2,000-$19,999].

Drugs (other than specifically categorized), possession with intent to distribute/sale [small scale (e.g., 200-999 doses)].

Marihuana/hashish, possession with intent to distribute/sale [medium scale (e.g., 50-199 lbs. of marihuana/5-19.9 lbs. of hashish/.05-.19 liters of hash oil)].

Cocaine, possession with intent to distribute/sale [small scale (e.g., 1.0-4.9 grams of 100% purity, or equivalent amount)].

Opiates, possession with intent to distribute/sale [evidence of opiate addiction and very small scale (e.g., less than 1.0 grams of 100% pure heroin, or equivalent amount)].

Firearms Act, possession/purchase/sale (single weapon: not sawed-off shotgun or machine gun).

Gambling law violations—managerial or proprietary interest in medium scale operation [e.g., Sports books (estimated daily gross $5,000-$15,000); Horse books (estimated daily gross $1,500-$4,000); Numbers bankers (estimated daily gross $750-$2,000)].

Property offenses (theft/forgery/fraud/embezzlement/interstate transportation of stolen or forged securities/income tax evasion/receiving stolen property) $2,000-$19,999.

Smuggling/transporting of alien(s) ..................................................

> 8 to 12 mo..... 12 to 16 mo... 16 to 20 mo... 20 to 26 mo.

**High**

Carnal Knowledge[3] ..............................................................

Counterfeit currency or other medium of exchange [(passing/possession) $20,000-$100,000].

Counterfeiting [manufacturing (amount of counterfeit currency or other medium of exchange involved not exceeding $100,000)].

Drugs (other than specifically listed), possession with intent to distribute/sale [medium scale (e.g., 1,000-19,999 doses)].

Marihuana/hashish, possession with intent to distribute/sale [large scale (e.g., 200-1,999 lbs. of marihuana/20-199 lbs. of hashish/.20-1.99 liters of hash oil)].

Cocaine, possession with intent to distribute/sale [medium scale (e.g., 5-99 grams of 100% purity, or equivalent amount)].

Opiates, possession with intent to distribute/sale [small scale (e.g., less than 5 grams of 100% pure heroin, or equivalent amount) except as described in moderate].

Firearms Act, possession/purchase/sale (sawed-off shotgun(s), machine gun(s), or multiple weapons).

Gambling law violations—managerial or proprietary interest in large scale operation [e.g., Sports books (estimated daily gross more than $15,000); Horse books (estimated daily gross more than $4,000); Number bankers (estimated daily gross more than $2,000)].

Involuntary manslaughter (e.g., negligent homicide).........................

Mann Act (no force-commercial purposes)..............................

Property offenses (theft/forgery/fraud/embezzlement/interstate transportation of stolen or forged securities/income tax evasion/receiving stolen property) $20,000-$100,000.

Threatening communications (e.g., mail/phone)—not for purposes of extortion and no other overt act.

> 12 to 16 mo... 16 to 20 mo... 20 to 26 mo... 26 to 32 mo.

**Very High**

Robbery—1 or 2 instances ...............................................................

Breaking and entering—armory with intent to steal weapons..........

Breaking and entering/burglary—residence; or breaking and entering of other premises with hostile confrontation with victim.

Counterfeit currency or other medium of exchange [(passing/possession)—more than $100,000 but not exceeding $500,000] [Drugs (other than specifically listed), possession with intent to distribute/sale [large scale (e.g., 20,000 or more doses) except as described in Greatest I].

See footnotes at end of table.

YOUTH/NARA GUIDELINES FOR DECISIONMAKING—Continued

| Offense | | | | |
|---|---|---|---|---|
| Marihuana/hashish, possession with intent to distribute/sale (very large scale (e.g., 2,000 lbs. or more of marihuana/200 lbs. or more of hashish/2 liters or more of hash oil)).<br>Cocaine, possession with intent to distribute/sale (large scale (e.g., 100 grams or more of 100% purity, or equivalent amount) except as described in Greatest I).<br>Opiates, possession with intent to distribute/sale (medium scale or more (e.g., 5 grams or more of 100% pure heroin, or equivalent amount) except as described in Greatest I).<br>Extortion (threat of physical harm (to person or property))............<br>Explosives, possession/transportation.....................................<br>Property offenses (theft/forgery/fraud/embezzlement/interstate transportation of stolen or forged securities/income tax evasion/receiving stolen property) more than $100,000 but not exceeding $500,000. | 20 to 26 mo. | 26 to 32 mo. | 32 to 40 mo. | 40 to 48 mo |

Greatest I

| Offense | | | | |
|---|---|---|---|---|
| Aggravated felony (e.g., robbery: weapon fired or injury of a type normally requiring medical attention)<br>Arson or explosive detonation (involving potential risk of physical injury to person(s) (e.g., premises occupied or likely to be occupied)—no serious injury occurred)<br>Drugs (other then specifically listed), possession with intent to distribute/sale (managerial or proprietary interest and very large scale (e.g., offense involving over 200,000 doses)).<br>Cocaine, possession with intent to distribute/sale (managerial or proprietary interest and very large scale (e.g., offense involving more than 1 kilogram of 100% purity, or equivalent amount))<br>Opiates, possession with intent to distribute/sale (managerial or proprietary interest and very large scale (e.g., offense involving more than 50 grams of 100% pure heroin, or equivalent amount)).<br>Kidnaping (other than listed in Greatest II, limited duration; and no harm to victim (e.g., kidnaping the driver of a truck during a hijacking, driving him to a secluded location, and releasing victim unharmed)).<br>Robbery (3 or 4 instances) ....................................................<br>Sex act—force (e.g., forcible rape or Mann Act (force))...............<br>Voluntary manslaughter (unlawful killing of a human being without malice, sudden quarrel or heat of passion) | 30 to 40 mo. | 40 to 50 mo. | 50 to 60 mo. | 60 to 76 mo |

Greatest II

| Offense | | | | |
|---|---|---|---|---|
| Murder: .........................................................................<br>Aggravated felony—serious injury (e.g., robbery: injury involving substantial risk of death, or protracted disability, or disfigurement) or extreme cruelty/brutality toward victim.<br>Aircraft hijacking .............................................................<br>Espionage .......................................................................<br>Kidnaping (for ransom or terrorism; as hostage; or harm to victim)<br>Treason ..........................................................................| 40 + mo .......... 50 + mo .......... 60 + mo ......... 76 + mo.<br>Specific upper limits are not provided due to the limited number of cases and the extreme variation possible within category. | | | |

[1] Alcohol or cigarette tax law violations involving $2,000 or more of evaded tax shall be treated as a property offense (tax evasion)

[2] Except that automobile theft (not kept more than 72 hours; no substantial damage; and not theft for resale) shall be rated as low severity. Automobile theft involving a value of more than $19,999 shall be treated as a property offense. In addition, automobile theft involving more than 3 cars, regardless of value, shall be treated as no less than high severity

[3] Except that carnal knowledge in which the relationship is clearly voluntary, the victim is not less than 14 years old, and the age difference between offender and victim is less than four years shall be rated as a low severity offense.

SALIENT FACTOR SCORE

Register Number _____

Name _____

Item A ................................. ☐

    No prior convictions (adult or juvenile) = 3
    One prior conviction = 2
    Two or three prior convictions = 1
    Four or more prior convictions = 0

Item B ................................. ☐

    No prior commitments (adult or juvenile) = 2
    One or two prior commitments = 1
    Three or more prior commitments = 0

Item C ................................. ☐

    Age at behavior leading to first commitment
    (adult or juvenile):
    26 or older = 2
    18–25 = 1
    17 or younger = 0

Item D ................................. ☐

    Commitment offense did not involve auto theft
    or check(s) (forgery/larceny) = 1
    Commitment offense involved auto theft [X], or
    check(s) [Y], or both [Z] = 0

Item E ................................. ☐

    Never had parole revoked or been committed
    for a new offense while on parole, and not a
    probation violator this time = 1
    Has had parole revoked or been committed for
    a new offense while on parole [X], or is a
    probation violator this time [Y], or both [Z] = 0

Item F ................................. ☐

    No history of heroin or opiate dependence = 1
    Otherwise = 0

Item G ................................. ☐

    Verified employment (or full-time school at-
    tendance) for a total of at least 6 months during
    the last 2 years in the community = 1
    Otherwise = 0

Total Score ........................... ☐

NOTE: For purposes of the Salient Factor Score, an instance of criminal behavior resulting in a judicial determination of guilt or an admission of guilt before a judicial body shall be treated as if a conviction, even if a conviction is not formally entered.

[44 FR 26542, May 4, 1979; 44 FR 27391, May 10, 1979]