John M. **GERAGHTY** and Edward Levine, Plaintiffs,

v.

**UNITED STATES PAROLE COMMIS-SION** and Attorney General of the United States, Defendants.

Civ. A. No. 76–1467.

United States District Court, M.D. Pennsylvania.

Oct. 29, 1982.

Patrick J. Glynn, Atty., Dept. of Justice, Frederick E. Martin, Asst. U.S. Atty., Lewisburg, Pa., for defendant.

Kenneth N. Flaxman, Chicago, Ill., for plaintiffs.

## MEMORANDUM

HERMAN, District Judge.

## I. INTRODUCTION

This action was initiated on September 15, 1976 when Plaintiff Geraghty filed a complaint seeking declaratory and injunctive relief in the United States District Court for the District of Columbia. Plaintiff attacked the Parole Commission and Reorganization Act, P.L. 94–233, 18 U.S.C. §§ 4201 *et seq.* (hereafter referred to as "PCRA"), and the regulations and guidelines promulgated thereunder, 28 C.F.R. § 2.20. The District of Columbia federal court ordered the case transferred to us on November 12, 1976 and we received the file on December 3, 1976.

Plaintiff Geraghty was convicted in the United States District Court for the Northern District of Illinois of conspiracy to commit extortion, 18 U.S.C. § 1951, and of making false material declarations to a grand jury, 18 U.S.C. § 1623. Geraghty had used his position as a vice squad officer on the Chicago police force to extort money from dispensers of alcoholic beverages. The false declarations concerned his involvement in this shakedown. Geraghty was sentenced to concurrent prison terms on January 25, 1974. His conviction was affirmed in *United States v. Braasch,* 505 F.2d 139 (7th Cir.1974), *cert. denied,* 421 U.S. 910, 95 S.Ct. 1562, 43 L.Ed.2d 775 (1975). The sentencing judge later reduced Geraghty's sentence because the parole guidelines would not have indicated parole before the expiration of his sentence. *United States v. Braasch,* No. 72 C.R. 979 (N.D. Ill.1975), *appeal dis'd and mandamus denied,* 542 F.2d 442 (7th Cir.1976).

Geraghty had applied for release by parole and had been denied in January of 1976. He applied again in June of 1976. The Parole Commission decided that a release date outside the parole guidelines did not appear warranted. Geraghty was therefore required to stay in prison, unparoled, until the expiration of his sentence, less good-time credits. Subsequent to the second denial of parole, Geraghty instituted this civil action by filing the complaint. On February 24, 1977, we denied Plaintiff's motion to certify a class, construed the action as a habeas corpus proceeding, and granted the Defendants' motion for summary judgment. *Geraghty v. United States Parole Commission,* 429 F.Supp. 737 (M.D.Pa.1977).

Geraghty, individually and on behalf of the class, appealed. On June 30, 1977, before any briefs were filed with the circuit

court, Geraghty had been mandatorily released from prison upon the expiration of his sentence. Both the Third Circuit Court of Appeals and the United States Supreme Court held that they had jurisdiction to hear the appeal of a plaintiff whose request for class certification had been denied, even if the claims of that plaintiff were made moot before the appellate courts could rule on the class issue.

The Third Circuit Court of Appeals, on March 9, 1978, reversed and remanded the case to us. *Geraghty v. United States Parole Commission,* 579 F.2d 238 (3d Cir.1978). The circuit court ruled that this case is not necessarily a habeas corpus action. "The class does not demand that its members be released on parole, but only that the Parole Board not utilize the guidelines in evaluating future parole applications." *Geraghty,* 579 F.2d at 244. The court concluded that this action could properly proceed as an action for declaratory judgment. *Id.* The court also ruled that we erred in failing to consider *sua sponte* the possibility of creating subclasses when we denied class certification. *Id.* at 252–53. Finally, the court decided that certain factual issues existed concerning the guidelines' lawfulness, thereby precluding the entry of summary judgment.[1] *Id.* at 268.

The United States Supreme Court granted certiorari, 440 U.S. 945, 99 S.Ct. 1420, 59 L.Ed.2d 632 (1979), and, on March 19, 1980, issued its opinion vacating the decision of the Court of Appeals for the Third Circuit and remanding the case for further proceedings. 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980). The Supreme Court rejected the circuit court's suggestion that we should have, *sua sponte,* considered subclasses when we rejected the proposed class. *Id.* at 408, 100 S.Ct. at 1214. The Court ruled that, on remand, it was our responsibility to determine the class issue anew and to decide whether Geraghty or some other representative can press the class claims.

On December 10, 1980, we reviewed Plaintiff's motions to certify a class and to amend the complaint and granted them in part and denied them in part. We certified the following class:

> All federal prisoners in the Middle District of Pennsylvania who are, or will become, eligible for parole release under 18 U.S.C. § 4205(a) and who have been, or who will be, denied parole and continued to the expiration of their sentence.

We limited the class certification to two of the five legal issues advanced by Plaintiff. First, is the PCRA facially unconstitutional? Second, are the regulations promulgated under the PCRA, especially the guidelines for decision-making, arbitrary and unlawful?[2]

By that same December 10, 1980 order, we dismissed the remaining three issues: first, the ex post facto effect of retroactive application of the guidelines to prisoners sentenced before the effective date of the PCRA and its regulations; second, the lawfulness of the *application* of the guidelines to prisoners in parole considerations; and last, the treatment of prisoners sentenced under 18 U.S.C. § 4205(b)(1) and (b)(2) compared to prisoners who received regular adult sentences and who are eligible for parole after serving one-third of their sentence. On December 30, 1980, an amended complaint was filed, with leave of court, adding Edward Levine as a party plaintiff. We approved the type of notice to the class on May 18, 1981 and held a non-jury trial on June 29, 1981. The transcript, exhibits, and briefs have now been filed and we will proceed to resolve this case on the merits.

## II. BACKGROUND OF THE PCRA

### A. General

In 1910, Congress enacted the first legislation authorizing the parole of federal pris-

---

1. The court also expounded at some length, although in dicta, on the merits of the lawfulness of the PCRA and the guidelines 579 F.2d at 254–67.

2. Plaintiffs' counsel argues that we need only consider the constitutionality of the PCRA if we believe the guidelines are consistent with it. We agree that if we find that the guidelines are

oners.[3] Act of June 25, 1910, ch. 387, § 1, 36 Stat. 819. Not until 1973, however, did the federal parole authority establish published regulations governing parole decisionmaking. 38 Fed.Reg. 26,652 (1973). Under the direction of the lead Defendant's predecessor, the United States Board of Parole, an experiment with the use of guidelines for parole decisions was conducted and found to be helpful in resolving problems in the federal parole system.[4] In apparent approval of the system devised by the Board of Parole, Congress enacted the PCRA in 1976, creating Defendant United States Parole Commission (hereafter referred to as "the Commission"), 18 U.S.C. § 4202, and *requiring* it to promulgate guidelines. 18 U.S.C. § 4203(a)(1).[5] The statute also mandates parole decisions in accordance with the guidelines promulgated under § 4203(a)(1) unless the Commission determines that there is good cause for departing from the guidelines. 18 U.S.C. § 4206(c).[6]

The general criteria for making parole decisions set forth in the PCRA are as follows:

If an eligible prisoner has substantially observed the rules of the institution or institutions to which he has been confined, and if the Commission, upon consideration of the nature and circumstances of the offense and the history and characteristics of the prisoner, determines:

(1) that release would not depreciate the seriousness of his offense or promote disrespect for the law; and

(2) that release would not jeopardize the public welfare; subject to the provisions of subsections (b) and (c) of this section, and pursuant to guidelines promulgated by the Commission pursuant to section 4203(a)(1), such prisoner shall be released.

18 U.S.C. § 4206. Congress enumerated certain material that the Commission was required to consider, if available and relevant:

(1) reports and recommendations which the staff of the facility in which such prisoner is confined may make;

(2) official reports of the prisoner's prior criminal record, including a report or record of earlier probation and parole experiences;

(3) presentence investigation reports;

(4) recommendations regarding the prisoner's parole made at the time of sentencing by the sentencing judge; and

(5) reports of physical, mental, or psychiatric examination of the offender.

18 U.S.C. § 4207. Congress also ordered that the Commission consider all additional relevant information that is reasonably available.

*B. Legislative History*

Congress began consideration of parole reform legislation in 1972 with the introduction of House Bill 13118 and Senate Bill S2883.[7] Successive sessions of Congress ex-

unlawful, then we need not address the PCRA issue.

**3.** For the general background and at least one commentator's view of the present federal parole system, see *Comment, Federal Parole Decisionmaking: Judicial Review for the Fortunate and Few*, 85 Dick.L.Rev. 501 (1981).

**4.** M. Gottfredson, P. Hoffman, & L. Wilkins, *Guidelines for Parole and Sentencing* 18–37 (1978). *See* Section III.A. *infra.*

**5.** *But see Geraghty v. United States Parole Commission*, 579 F.2d 238, 257 & n. 82 (3d Cir.1978) (the specifics of the existing guidelines were under some attack).

**6.** Section 4206(c) also requires the Commission to provide the prisoner with written reasons for

its decision to grant or deny parole authority notwithstanding the guidelines.

**7.** At the beginning of the 92d Congress, the House Subcommittee on Courts, Civil Liberties, and the Administration of Justice undertook an extensive nationwide review of the problems of the penal justice system. H.R.Rep. No. 94–184, 94th Cong., 1st Sess. (1975). The Subcommittee on National Penitentiaries of the Senate Judiciary Committee also began seeking legislative answers to the criticisms directed at the parole process. Following the appointment of Maurice H. Sigler as Chairman of the U.S. Board of Parole in 1972, a working relationship developed between the Board and the two Subcommittees. H.R.Conf.Rep. No. 94–838, 94th Cong., 2d Sess. 6, *reprinted in* [1976] U.S.Code & Ad.News 351, 359.

amined proposed amendments to the parole statute. On May 13, 1975, the House Judiciary Committee reported H.R. 5727, accompanied by House Report 94–184. *See* H.R. Rep. No. 94–184, 94th Cong., 1st Sess. (1975). It was considered and passed by the House on May 21, 1975. 121 Cong.Rec. 15716. The Senate Judiciary Committee reported an amended version of H.R. 5727 on September 11, 1975, accompanied by Senate Report 94–369. *See* S.Rep. No. 94–369, 94th Cong., 1st Sess. 25, *reprinted in* [1976] U.S.Code Cong. & Ad.News 335. The amended version was passed by the Senate on September 16, 1975. The House and Senate versions differed markedly in their approaches to the problems of parole reform.

*1. The House Bill*

The most distinguishing feature of the House Bill was the presumption it created in favor of parole at the time of eligibility. Section 4205 of the House Bill provided that

(a) *A prisoner shall be released on parole* if his record shows that he has substantially observed the rules of the institution in which he is confined *on the date of his eligibility* for parole, *unless* . . .

(1) there is a reasonable probability that such prisoner will not live and remain at liberty without violating any criminal law;

(2) there is a reasonable probability that such release would be incompatible with the welfare of society; or

(3) the prisoner's release on such date would so deprecate the seriousness of his crime as to undermine respect for the law.

．　　．　　．　　．　　．

8. Subsection (b) of Section 4205 of the House Bill stated:

Any prisoner not earlier released under subsection (a) . . . *shall be released* on parole *after he has served two-thirds* of his sentence, or after twenty years in the case of a sentence of thirty years or longer . . . whichever is earlier, *unless* it is determined that he should not be so released because there is a high likelihood that he will engage in conduct violating any criminal law.

H.R.Rep. No. 94–184, *supra*, at 20 (emphasis added).[8]

In most instances a prisoner would be eligible for parole, at the latest, after he had served one-third of his sentence.[9]

Section 4206 of the House Bill specified the information to be considered in making a parole determination:

[T]here shall be taken into account the factors established by the Commission under section 4202(a)(1) [authorizing the promulgation of general policies, guidelines, rules and regulations]; and

(1) any reports and recommendations which the staff of the facility in which such prisoner is confined may make;

(2) any official report of the prisoner's prior criminal record, including a report or record of earlier probation and parole experiences;

(3) any presentence investigation report;

(4) any *recommendation* regarding the prisoner's parole made at the time of sentencing by the sentencing judge; and

(5) any reports of physical, mental, or psychiatric examination of the offender. There shall also be taken into consideration such additional relevant information concerning the prisoner (including information submitted by the prisoner) as may be reasonably available.

*Id.* at 21. In addition, the House Report declared: "It is the intent of the Committee that all available information on the efforts that the prisoner may have made to improve his education, skills, or personal attributes be considered by the Commission." *Id.* at 6. House Bill 5727 also required the Commission to furnish the prisoner with written reasons for its decision, including a

. . . .

9. If a prisoner is serving a definite term of over 180 days, he is eligible for parole at the one-third point in his sentence. The sentencing court, however, could specify a minimum term to be served, not more than one-third of the maximum, or direct that the prisoner be immediately eligible for parole. H.R.Rep. No. 94–184, *supra* at 4–5.

summary of the evidence relied upon if parole is denied, and directed the examining panel "to advise the prisoner of what he ought to do to enhance his prospects for parole." *Id.* at 7. These latter provisions were aimed at providing "an infusion of due process into Federal Parole procedure," to correct a system the House Committee viewed as "the single most inequitable, potentially capricious, and uniquely arbitrary corner of the criminal justice map." *Id.* at 2.

### 2. The Senate Bill

The Senate Bill, in contrast, was couched in more conservative terms. While acknowledging the criticism directed at the existing parole system and the need for "both the fact and appearance of fairness to all," the Senate Committee on the Judiciary also recognized the importance of balancing concern for equity toward the individual inmate against "responsibility for the protection of the larger society." S.Rep. No. 94–369, 94th Cong., 1st Sess. 25, *reprinted in* [1976] U.S.Code Cong. & Ad.News 335, 340.

The Senate Bill eliminated the presumption in favor of parole contained in the House version. Instead, the Senate measure retained existing criteria for making parole decisions at the time of parole eligibility.[10] Parole would *not* be granted *unless* the Commission determined that, first, the individual had substantially observed the rules of the institution; second, there is a reasonable probability that he will not violate the law on release; and last, his release is compatible with the general welfare of society. S.Rep. No. 94–369, *supra,* at 344.

The Senate legislation anticipated the adoption of administrative guidelines to "give definiteness to the indefinite nature of most federal criminal cases—by reducing the opportunity for sentencing disparity

and abuse of discretion and by giving to parole an aura of fairness for both victim and offender." *Id.* at 340. The Commission was required to meet periodically to establish procedural rules and guidelines for parole determinations "so that the administration of parole throughout the Federal System will be uniform." *Id.* at 342. The Senate report referred explicitly to the guidelines then in use by the Parole Board as a result of its experimental project. *See id.* at 340 & 346.[11] Although the Senate Committee did not intend the existing guidelines to remain unchanged, *id.* at 340 & 347, the Committee's comments clearly indicated approval of the system. In the language of the Report,

> The guidelines take into account the circumstances of the individual both in his personal life and with respect to the offense which he has committed, as well as measuring the severity of the offense involved so as to significantly reduce the area of discretion which the Parole Commission, in fact, has in any given case.

*Id.* at 340.

Under the Senate Bill, a parole decision pursuant to the guidelines was to be made primarily on the basis of a report prepared by the Bureau of Prisons summarizing the prisoner's criminal and social background, his mental and physical health, and his institutional behavior and participation in institutional programs. *Id.* at 344. The Commission was also authorized to seek additional information from other government agencies. *Id.* Once a parole decision was made, the inmate was to receive a written statement of the determination, including an "understandable explanation" of the application of the guidelines, or of the factors causing a determination outside the guidelines. *Id.* at 346.

---

**10.** The times set for parole eligibility were substantially the same in both the Senate and House Bills. *See* note 9 *supra.* They now appear in Section § 4205 of the PCRA.

**11.** The reference to the promulgation of guidelines in the House Bill, in contrast, was a vague

and general one. *See* H.R.Rep. No. 94–184, *supra,* § 4202(a) at 17. In the House system, with its emphasis on a presumption of parole at a fixed time, the need for definitive guidelines, to provide more certainty in the parole process, was significantly reduced.

### 3. The Conference Report

The bill that emerged from the House-Senate Conference Committee, which eventually became the PCRA, represented a compromise between the diverse positions of the House and the Senate. The Conference Committee chose to delete the House Bill's presumption of parole at eligibility. Instead, the Conference Report adopted the approach of the Senate version, designating the Parole Commission guidelines as "the fundamental gauge" for a parole policy "which seeks to achieve both equity between individual cases and a uniform measure of justice." H.R.Conf.Rep. No. 94–838, 94th Cong., 2d Sess. 6, *reprinted in* [1976] U.S.Code Cong. & Ad.News 351, 359.[12]

Although the Conferees eliminated language in the Senate Report characterizing parole as "an extension of the sentencing process," *compare* S.Rep. No. 94–233, *supra*, at 337 *with* H.R.Conf.Rep. No. 94–838, *supra*, at 352, they retained the Senate Report's description of the Bill as "having the practical effect of balancing differences in sentencing policies between judges and courts." *Id.* Determination of the actual length of incarceration of an offender was committed to the discretion of the Parole Commission. *Id.* The Commission was designated as the agency "responsible for keeping in prison those who because of the need for accountability to society or for the protection of society must be retained in prison." *Id.* It is the job of the Commission to identify those individuals who are ready to be responsible citizens. *Id.* The

information that the Commission must consider in performing its task was specified—a list identical to that included in the House Bill[13]—but the weight to be accorded any particular piece of information was a judgment solely within the province of the Commission. *Id.* at 360.

The Commission's discretionary power to make parole decisions was limited, however, by permitting decisions outside the guidelines only when there is good cause to do so. The Conference Report interpreted good cause as "substantial reason" and "only those grounds put forward by the Commission in good faith and which are not arbitrary, irrational, unreasonable, irrelevant or capricious." *Id.* at 359. The Conferees further directed that "[i]f decisions to go above or below parole guidelines are frequent, the Commission should re-evaluate its guidelines." *Id.* at 360.

In any case in which the decision is outside the guidelines the Commission must provide the prisoner with a written explanation setting forth with particularity the reasons, including a summary of the information relied upon. 18 U.S.C. § 4206(c). In addition, the hearing examiners, when feasible, must advise the prisoner of what he could do to enhance his prospects for parole. 18 U.S.C. § 4208(g). These latter two requirements of the Conference Bill (PCRA) are similar to those found in the House Bill, but the Conference Report added this significant caveat:

---

**12.** *Compare* S.Rep. No. 94–369, *supra*, at 340. Although the Conference Report clearly contemplated the use of guidelines and alluded to the reorganization of the Parole Board "along the lines of the legislation presented here," H.R.Conf.Rep. No. 94–838, *supra*, at 352, the language of the Report does not contain any specific reference to the guidelines then in effect. The circuit court, in its previous decision in this matter, considered this extremely slight change of emphasis from the Senate Report a significant point. *See Geraghty*, 579 F.2d at 258 & n. 91. We respectfully disagree. We read the directive to the Commission to be "cognizant of past criticism of parole decisionmaking," H.R.Conf.Rep. No. 94–838, *supra*, at 359, as a reference to the lack of uniformity and potential inequity in the previous case-by-case decisionmaking, rather than to the objec-

tions to the guidelines voiced during the Congressional debates on the PCRA. *See Geraghty*, 579 F.2d at nn. 82 & 83. The House and Senate Subcommittees enjoyed a "working relationship" with the Parole Board during the formulation of this legislation, and the Conference Committee was surely aware of the guidelines as then employed by the Parole Board. H.R.Conf.Rep. No. 94–838, *supra*, at 352. Under these circumstances, we find it difficult to avoid construing the absence of express *disapproval* of any particular feature of the then-current guidelines as a form of tacit *approval*.

**13.** *Compare* 18 U.S.C. § 4207, set forth at page 279 *supra*, *with* § 4206 of the House Bill, quoted at page 280 *supra*.

"The Conferees intend that this requirement for advice on future parole prospects be narrowly construed. In situations in which the prisoner has been convicted of a serious offense, there may well be nothing that he can do to enhance his parole potential until service of some period of time has been completed. Moreover, promises of parole should not be used to coerce inmate participation in institutional programming.

H.R.Conf.Rep. No. 94–838, at 362.

The Conference Bill passed the Senate on March 2, 1976, and the House on March 3, 1976. [1976] U.S.Code Cong. & Ad.News 335.

## III. THE GUIDELINES

### A. Origin[14]

In 1971, the research staff of the National Counsel on Crime and Delinquency, working in conjunction with the United States Board of Parole (hereinafter referred to as the "Parole Board"), began an extensive study of parole decision-making. One portion of the project involved an examination of parole decisions in Youth Correction Act cases [15] (hereinafter referred to as "YCA") to determine if certain factors—offense severity, parole prognosis, institutional program participation and institutional discipline—could predict parole decision-making. (Transcript at 11–12).[16] One of the conclusions of the project was that offense severity and parole prognosis ratings made by members of the Youth Corrections Division of the Parole Board could predict the actual decisions made at initial hearings in YCA cases.[17] (Tr. at 12; Plaintiff's Exhibit No. 28, P. Hoffman, Parole Selection Practice: Two Feedback Methods, at 71 (unpublished doctoral dissertation)).[18]

Based on the results of this study, the Parole Board structured its policy for future parole decisionmaking around the two factors of offense severity and risk of recidivism (parole prognosis). (Wilkins Deposition at 89, 98–100; Hoffman Deposition at 125). The Parole Board, however, determined to utilize objective measures of offense severity and statistical predictors of parole prognosis rather than ratings based on subjective, individualized judgments made on a case-by-case basis.[19] (Hoffman Deposition at 125). These objective meas-

---

**14.** Defendants have argued that the research project from which the original guidelines were developed is not relevant to the question of whether the guidelines are valid under the PCRA. We believe, however, that an examination of the development of the guidelines serves the limited purpose of elucidating the policies the Parole Commission intended to implement by adoption of the guidelines. If these policies are indeed effectuated by the guidelines, it is relevant to consider whether or not they comport with the policies embodied in the PCRA. However, the validity of the research project itself, or even whether the conclusions of the study could legitimately be applied to actual parole decisionmaking are *not* relevant questions in this case. Therefore, Plaintiffs' Exhibits Numbers 26–46 and 55–61, which concern a 1972 and 1973 parole background study, and on which we previously reserved our ruling, are admitted into evidence for the limited purpose of clarifying the Parole Commission's policies underlying the guidelines.

**15.** 18 U.S.C. §§ 5005 to 5026. A sentence under the YCA has no minimum and a maximum of six years. *Id.* §§ 5010 & 5017. Offenders committed under YCA provisions are immediately eligible for parole. *Id.* § 5017(a). The YCA is not applicable if the court finds that the offender would not derive benefit from "treatment," designed to correct the antisocial tendencies of youth offenders. *Id.* §§ 5010 & 5006(f).

**16.** Hereinafter, the trial transcript will be cited as "Tr."

**17.** The initial hearing in a YCA case is generally held within three to four months of commitment.

The study also found that ratings assigned to institutional discipline were predictive of YCA decisions at review hearings. (Tr. at 12).

**18.** Hereinafter, exhibits introduced at trial will be cited as "Plaintiffs' Ex. No." or "Defendants' Ex. No."

**19.** The assessments made in the YCA study, in contrast, reflected the subjective viewpoints of the Parole Board member as he considered each individual case. (Hoffman Deposition at 122–23). Dr. Peter Hoffman, who conducted the YCA study, has expressed the opinion that the objective measures exhibit a strong correlation to the subjective judgments recorded in the YCA study. (Hoffman Deposition at 123–24).

ures would then be applied to the particular facts of each parole case.[20]

On November 19, 1973, the Parole Board issued its first set of parole policy guidelines. 28 C.F.R. § 2.52, *as amended* 38 Fed. Reg. 31942 *et seq.* (Nov. 19, 1973). The format was substantially the same as the guidelines currently in use. On May 12, 1976, two days before the PCRA went into effect, the Parole Board published in the Federal Register a set of emergency regulations, including parole guidelines, to implement the PCRA. 41 Fed.Reg. 19326 *et seq.* (May 12, 1976). The Board also published a notice of proposed rulemaking and invited public comment on the emergency regulations. 41 Fed.Reg. 19341 (May 12, 1976). After opportunity for public comment on the proposed regulations, the Commission published a set of final rules, including guidelines, on September 3, 1976. 41 Fed. Reg. 37316 *et seq.* (Sept. 3, 1976). The guidelines have been amended numerous times in the intervening years, making various refinements to the system.

### B. Operation

The guidelines consist of two scales which together determine the range of "customary total time" an inmate must ordinarily serve before parole will be granted. The first scale—the "offense severity scale"—categorizes a comprehensive list of federal crimes into seven groupings, ranging from "Low" to "Moderate" to "Greatest II."[21] The offenses are ranked without regard to the maximum-minimum penalties set by Congress. For each level of severity, the "offense severity scale" lists four ranges of "customary total time." *See* Appendix I.

The second scale, known as the "salient factor scale," measures parole prognosis.

The salient factor score is the sum of points assigned by the Commission to seven items in the inmate's background. Five of these items deal with previous criminality, one considers opiate dependence, and one considers recent employment or school attendance. *See* Appendix II. In theory, the higher the score, the lower the probability of recidivism will be. A clinical evaluation of risk, however, may override the salient factor score. 28 C.F.R. § 2.20(e).

After determining the offense severity and calculating the salient factor score, the Commission places the particular inmate's score and severity rating on a grid, and thus arrives at the customary total time to be served before release. The customary total time has no relationship to the sentence actually imposed on the inmate, although no inmate can be detained beyond the maximum term set by the court or released before any minimum term the sentencing judge might designate. (Tr. at 48). Furthermore, the guidelines are designed for cases with good institutional adjustment and program progress. 28 C.F.R. § 2.20(b). Substantial observance of institutional rules is a threshold requirement for consideration for parole. 18 U.S.C. § 4206(a).

The regulations specifically designate the "customary total time" ranges as "merely guidelines." "Where the circumstances warrant, decisions outside of the guidelines (either above or below) may be rendered." 28 C.F.R. § 2.20(c). According to the Commission's own statistics (Plaintiffs' Ex. No. 24, United States Parole Commission Research Unit, Report 18: Workload and Decision Trends 10/74–9/77 (December 1977); Plaintiffs' Ex. No. 25, United States Parole Commission Research Unit, Report 24: Workload and Decision Trends, Fiscal Years

---

**20.** Contemporaneously with the initial promulgation of the parole guidelines, the Parole Board was in the process of administratively reorganizing into five regions, 38 Fed.Reg. 26652 (Sept. 24, 1973); delegating to two-member panels of hearing examiners the power to make tentative parole decisions, 28 C.F.R. § 2.13, 38 Fed.Reg. 26653 (Sept. 23, 1973); and establishing a two-stage administrative appeal procedure, 28 C.F.R. §§ 2.20–2.21, *as amended*

38 Fed.Reg. 26654 (Sept. 23, 1973). Objective measures of determining offense severity and parole prognosis would limit the subjective judgments of the individual hearing examiners and assist in maintaining a consistent parole policy throughout the regions. (*See* Hoffman Deposition at 125).

**21.** Aggravating circumstances increase the severity of the rating.

1978–1980 (January 1981)), approximately eighty percent of the decisions at initial hearings fall within the customary total time recommended by the guidelines.[22]

## IV. DISCUSSION

### A. Validity of the Guidelines

Plaintiffs attack the guidelines on the ground that they violate the PCRA in the following particulars:

First, rehabilitation and institutional behavior are not afforded any significant weight in the decision to grant parole;[23] Second, the Commission may disregard the sentence actually imposed; and Last, the Commission has devised its own system of measuring accountability.[24]

### 1. Rehabilitation and Institutional Performance

■ It is axiomatic that in considering the validity of any regulations promulgated under a statute, one must first look to the language of the statute itself. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975). Our initial analysis, therefore, must juxtapose the Plaintiffs' contentions against the pertinent provisions of the PCRA.

■ Plaintiffs claim that in the PCRA Congress "has explicitly directed" that rehabilitation and institutional behavior "re-main central in parole decisionmaking." (Plaintiffs' Post-Trial Brief at 29). They assert that the statutory language is not consonant with the elimination of rehabilitation as the primary focal point in the parole process, and does not authorize the Commission to consider institutional behavior only as a negative factor.

We cannot agree, however, that the statute on its face places its *primary* emphasis on the rehabilitation of the inmate. To the contrary, Section 4206 mentions *several* factors that must be included in the review of every prisoner's case: substantial adherence to the rules of the institution, the nature and circumstances of the offense, the history and characteristics of the prisoner. Thus, "Section 4206 does not state that good institutional adjustment is a major factor in determining whether to parole, but rather only one of many factors." *Hayward v. United States Parole Commission,* 659 F.2d 857, 861 (8th Cir.1981), *cert. denied,* 456 U.S. 935, 102 S.Ct. 1991, 72 L.Ed.2d 454 (1982).

Furthermore, the only *explicit* reference to institutional behavior in the statute is phrased in terms of a *prerequisite* to parole, that is, "*[i]f* an eligible prisoner has substantially observed the rules of the institution . . . ." 18 U.S.C. § 4206(a) (emphasis added). This language would appear to sanction the use of institutional perform-

---

**22.** A decision to deny parole and continue to expiration because a prisoner's sentence is too short to allow him to serve the customary total time is counted by the Commission as a decision within the guidelines. (Tr. at 56).

The question of whether the guidelines are mechanically applied is not at issue in this case. We are concerned only with the facial validity of the regulations. We agree, however, with the court in *Garcia v. Neagle,* 660 F.2d 983, 991 (4th Cir.1981), *cert. denied,* 454 U.S. 1153, 102 S.Ct. 1023, 71 L.Ed.2d 309 (1982), that given the clear directive of the Conference Report to re-evaluate the guidelines when decisions outside the guidelines are too frequent, H.R.Conf.Rep. No. 94–838, *supra,* at 360, less than 80% conformity with the guidelines may well violate the statute.

Although we have referred to Plaintiffs' Exhibit Nos. 24 & 25, they relate to the application issue and are irrelevant to this action. Nevertheless, we admit these exhibits as well as Exhibits 21–23, on which we also reserved our ruling at trial, for purpose of possible appeal.

**23.** Plaintiffs raise as a separate and distinct ground for invalidating the guidelines another issue, that is, that under the guidelines institutional behavior operates only as a negative factor in the parole decision. We think that this issue is subsumed within the more general question of whether the guidelines impermissibly exclude meaningful consideration of rehabilitation and institutional performance.

Defendants object that Plaintiffs lack standing to challenge the treatment of institutional behavior under the guidelines. We find this position to be without merit.

**24.** Although we have chosen to treat this question as a separate issue, it is obviously related to the second issue, the freedom the Commission has to disregard actual sentence length.

ance as a *negative* factor. We hesitate to find, however, that the statute excludes the possibility of a positive use for the inmate's institutional record. Section 4207 requires the Commission to consider, *inter alia,* "reports and recommendations which the staff of the facility ... may make." 18 U.S.C. § 4207(1). Reading this section of the statute together with § 4206, therefore, we think that the inmate's institutional behavior is a part of the "history and characteristics of the prisoner" that must be reviewed by the Commission.

Plaintiff argues that since positive information regarding institutional behavior is not taken into account in calculating the "salient factor score," and the initial hearing is held within 120 days of incarceration, 28 C.F.R. § 2.12(a), the inmate's record at the institution and his progress toward rehabilitation have a negligible impact. *See Moore v. Nelson,* 611 F.2d 434, 438 n. 8 (2d Cir.1979). We note, however, that a *clinical* evaluation of risk may override the salient factor score, 28 C.F.R. § 2.20(e), and that the Commission may depart from the guidelines when there is "good cause" to do so. 18 U.S.C. § 4206(c). Moreover, at subsequent hearings "significant developments or changes in the prisoner's status" are taken into consideration. 28 C.F.R. § 2.14(a). Under 28 C.F.R. § 2.14(a)(2)(ii), a presumptive release date may be advanced for "superior program achievement." *Id.*[25] *See also* 28 C.F.R. § 2.60.

While we think that the role played by institutional factors under the guidelines is entirely consistent with the language of the PCRA on its face, we recognize that regulations such as these may fulfill the letter of the legislation, yet simultaneously contra-

vene the spirit of the statute. *Holy Trinity Church v. United States,* 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892). A careful analysis of the legislative history is in order, therefore, to remove any lingering doubts about the validity of the guidelines in regard to this issue.

We have previously set forth the sequence of legislative events and summarized the significant reports accompanying them.[26] The entire tenor of the original legislation passed by the House, and the report accompanying the bill, indicates an emphasis on the concerns of the individual inmate. Discussing the information that must be considered by the Commission, the House Report speaks in terms of "the efforts ... made to *improve* his [the inmate's] education, skills, or personal attributes...." H.R.Rep. No. 94–184, *supra,* at 6 (emphasis added). *See* page 280, *supra.* In addition, under the House version of the bill, if parole was denied, the prisoner was to be advised of what he could do to improve his prospects for parole. H.R.Rep. No. 94–184, *supra,* at 7. *See* page 281, *supra.* Clearly, the House Bill contemplated rehabilitation as playing a significant role in the parole process.

In the Senate Report, the focus of the legislators shifted. Although we do not think that rehabilitation and institutional progress were *eliminated* as factors by the Senate Subcommittee, the emphatic language of the House Report does not appear in the Senate Report.[27] Instead, the Senate Report all but endorsed the guidelines as developed by the Parole Board.

Although the bill that came out of the House-Senate Conference effected a com-

---

**25.** The regulations governing the initial and interim hearings and the provision for "superior program achievement" technically are not part of the guidelines challenged by Plaintiffs. Nevertheless, we agree with the Defendants that the guidelines must be examined in the context of the entire parole system in order to determine if the regulations violate the PCRA.

**26.** Although only the Conference Report directly expresses the intent of Congress in regard to the PCRA, the Conferees did not write in a vacuum. Perusal of the House and Senate Re-

ports is helpful, therefore, in our attempt to ascertain the proper interpretation of the Conference Report itself.

**27.** In the Senate Report, the inmate's institutional behavior and participation in institutional programs are merely mentioned as among those items the Bureau of Prisons would include in its summary of the inmate's background. S.Rep. No. 94–369, *supra,* at 344. *See* page 281 *supra.*

promise between the respective positions of the two houses, in our view the Conference Report embraces the basic approach taken by the Senate. *See* page 282, *supra.* The guidelines were retained as the mainstay of the legislation. More importantly, the formulation of the guidelines was committed to the *Commission.* Congress expressly declined to write into the statute the precise method by which parole performance would be predicted because it was the intent of the Conferees "to encourage the newly created Parole Commission to continue to refine both the criteria which are used and the means for obtaining the information used therein." H.R.Conf.Rep. No. 94–838, *supra,* at 359. Moreover, while the PCRA incorporated the information which the House Bill required to be considered in each parole decision, the Conferees pointedly stated that "*the weight assigned to individual factors (in parole decision-making) is solely within the province of the (commission's) broad discretion.*" *Id.* at 360 (emphasis added). Assessing the same issue that we now face, the court in *Wilden v. Fields,* 510 F.Supp. 1295 (W.D.Wis.1981), found this expression of legislative intent conclusive evidence of the validity of the guidelines. *Id.* at 1305. *See also Shahid v. Crawford,* 599 F.2d 666, 670 (5th Cir.1979) (Congress intended Commission, not courts, to decide significance of particular information about prisoners). We agree. We note, in addition, the limiting construction placed by the Conferees on the provision adopted from the House Bill directing the hearing examiners to advise the prisoner of steps he could take to enhance his parole prospects. The Conferees recognized that in many situations the inmate could do little, if anything, to improve his parole status. H.R. Conf.Rep. No. 94–838, *supra,* at 362. *See*

page 283 *supra.* We interpret this passage of the Conference Report as an implicit acknowledgment that positive institutional behavior may have little impact on the parole decision.[28] *See also* H.R.Conf.Rep. No. 94–838, *supra,* at 357–360 (analysis of § 4206 does not mention rehabilitation).

### 2. Sentence Length

■ Plaintiffs complain that the guidelines are invalid because they do not provide for consideration of sentence length in the parole decision-making process. Defendants counter, and we must agree, that the statute itself makes no explicit mention of the sentence actually imposed as a factor the Commission must consider. Furthermore, we find it difficult to construe the general criteria set forth in Section 4206 to encompass sentence length. The twin conclusions that release of a prisoner would not "depreciate the seriousness of his offense or promote disrespect for the law," and would not "jeopardize the public welfare" are reached by examining "the nature and circumstances of the offense" and "the history and characteristics of the prisoner." 18 U.S.C. § 4206. Thus, the Commission must review the character of the *offense,* not the sentence imposed for that offense. Arguably, "the history and characteristics of the prisoner," 18 U.S.C. § 4206(a), could include the sentence he is currently serving. When Congress expressly itemized the information that the Commission is required to consider, however, it failed to specify sentence length. Instead, Congress included in the list "recommendations regarding parole ... by the sentencing judge." 18 U.S.C. § 4207(4).

Nor can we glean from the legislative history an intention to make sentence length the starting point for the evaluation

---

**28.** Plaintiffs point to a study of recidivism by Howard Bloom as evidence that a statistical predictor can include factors which change during imprisonment. (Plaintiffs' Ex. No. 54, Bloom, *Evaluating Human Service and Correctional Programs by Modeling the Timing of Recidivism,* 8 Soc. Methods & Research 179 (Nov. 1979)) Such evidence is irrelevant. It does not matter if we think that parole prognosis should be evaluated in a different manner.

The sole question here is whether the method used by the Commission comports with the dictates of the statute.

We note that Plaintiffs' Ex. Nos. 47–53, like Plaintiffs' Ex. No. 54, are a series of articles and reports, and are likewise irrelevant to the issues at bar. Regardless, these exhibits, on which we had reserved our ruling, are admitted for the purpose of possible appeal.

performed by the Commission. Sentence length was controlling under the House Bill, as we have seen, but that approach was rejected by the Conference Committee. Both the Senate Report and the Conference Report speak of the release decision as one "shared" by the three branches of government. *See* S.Rep. No. 94–369, *supra,* at 336; H.R.Conf.Rep. No. 94–838, *supra,* at 351. Significantly, both Reports recognize that "[t]he final determination of precisely how much time an offender must serve is made by the parole authority," the executive branch. S.Rep. No. 94–369, *supra,* at 337; H.R.Conf.Rep. No. 94–838, *supra,* at 352. The Reports also describe the functions performed by the judicial and legislative branches in the scheme: the court sets a minimum and maximum term, within a range of discretion fixed by Congress. *Id.* at 337 & 352. Nowhere in either version is there an indication that the parole authority must do more than operate within the constraints provided by the judicial and legislative branches. *See Garcia v. Neagle,* 660 F.2d 983, 991 (4th Cir.1981), *cert. denied,* 454 U.S. 1153, 102 S.Ct. 1023, 71 L.Ed.2d 309 (1982), (sentence serves to define outer limits of parole eligibility). To the contrary, the analysis of Section 4206 in the Conference Report states:

> It is the intent of the Conferees that the Parole Commission make certain judgments pursuant to this section, and that *the substance* of those judgments *is committed to the discretion of the Commission.*

H.R.Conf.Rep. No. 94–838, *supra,* at 358 (emphasis added). The Conference Report then continues,

> Determinations of just punishment are part of the parole process, and these determinations cannot be easily made because they require an even-handed sense

of justice ... it is important for the parole process to achieve an aura of fairness by *basing determinations of just punishment on comparable periods of incarceration for similar offenses committed under similar circumstances.*

*Id.* (emphasis added). A finding that the parole decision process must use the individual sentence length as its point of embarkation would frustrate this directive.[29] Moreover, the Conference Report instructs "[t]he parole decision-makers" to "weigh the concepts of general and special deterrence, retribution and punishment, all of which are matters of judgment ...." in reaching their determination of just punishment. *Id.* No mention is made of the assessment of these concepts made by the court in arriving at a sentence. It is the Commission's *own judgment* that is called for, because sentencing and parole are separate, although related, processes.

Our view of the interaction between sentencing and parole intended by Congress is one apparently shared by the Supreme Court. In *United States v. Addonizio,* 442 U.S. 178, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979), Justice Stevens commented,

> "The decision as to when a lawfully sentenced defendant shall actually be released has been committed by Congress, with certain limitations, to the discretion of the Parole Commission. Whether wisely or not, Congress has decided that the Commission is in the best position to determine when release is appropriate, and in doing so, to moderate the disparities in the sentencing practices of individual judges.

*Id.* at 189, 99 S.Ct. at 2242. *See also Garcia v. Neagle,* 660 F.2d 983, 990–91 (4th Cir. 1981), *cert. denied,* 454 U.S. 1153, 102 S.Ct. 1023, 71 L.Ed.2d 309 (1982); *Priore v. Nel-*

---

**29.** Dr. Peter Hoffman has expressed the view that sentence length is factored into the parole decision as an indicator of unusual circumstances. He explains that,

> If you have a case where you have an unusually long [sentence] ... you probably would examine the record over to look for an aggravating factor that resulted in the imposition of what appears to be an extremely

long sentence ... then you could use that aggravating factor as a reason for going above the guidelines .... The examiners, because they have to assess the limits of the discretion, will be aware of the sentence length.

(Tr. at 49). The process is the same, of course, for an unusually light sentence. (Tr. at 50).

son, 626 F.2d 211 (2d Cir.1980); *Hawkins v. United States Parole Commission,* 511 F.Supp. 460, 461 (E.D.Va.1981), *aff'd,* 679 F.2d 881 (4th Cir.1982); *Wilden v. Fields,* 510 F.Supp. 1295, 1300–01 (W.D.Wis.1981).

Thus, although we agree with other courts and commentators that the Commission might do well to give more deference to the sentence pronounced by the court, we do not think that deference is a requirement imposed by the PCRA.[30]

### 3. Accountability

■ Plaintiffs' next argument is the logical corollary of their attack on the ability of the Commission to disregard the sentence actually imposed. Plaintiffs' contend that the guidelines constitute a system of accountability unauthorized by the PCRA. They argue that the "offense severity rating" represents the Commission's own judgment of the seriousness of the offense and how much time the offender should serve in prison, independent of the sentence set by the court and the maximum penalty designated by Congress. Plaintiffs' position, that Congress did not sanction such independent judgments, is contradicted by both the terms of the statute itself and the language of the Conference Report.

The statute clearly contemplates judgments regarding offense severity when it directs the Commission to determine "that release would not depreciate the seriousness of his offense or promote disrespect for the law ..." based upon, *inter alia,* "consideration of the nature and circumstances of the offense..." 18 U.S.C. § 4206(a). A glance at the Conference Report, however, more vividly exposes the intention of the drafters of the PCRA to entrust the Commission with the task of assessing accountability in

making its release decisions. Repeatedly, the Conference Report stresses this aspect of the Commission's job:

Nearly all men and women sent to prison as law breakers are eventually released, and the decision as to when they are released is shared by the three branches of government ... The sentences of nearly all offenders include minimum and maximum terms, ordinarily set by the sentencing court within a range of discretion provided by statute. *The final determination of precisely how much time an offender might serve is made by the parole authority....* In the first instance, parole has the practical effect of balancing differences in sentencing policies and practices between judges and courts in a system that is as wide and diverse as the Federal criminal justice system. In performing this function, *the parole authority must have in mind some notion of the appropriate range of time for an offense which will satisfy the legitimate needs of society to hold the offender accountable for his own acts...* Once sentence has been imposed, *parole is the agency responsible for keeping in prison those who because of the need for accountability to society* or for the protection of society *must be retained in prison....*

H.R.Conf.Rep. No. 94–838, *supra,* at 351–52 (emphasis added).

It is the intent of the Conferees that *the Parole Commission,* in making each parole determination, *shall recognize and make a determination as to the relative severity of the prospective parolee's offense* and that in so doing shall be cognizant of the public perception of and respect for the law. It is the view of the

30. The *Addonizio* decision did not pass upon the validity of the parole guidelines. The Supreme Court considered the guidelines in the context of its ruling that a prisoner cannot attack his sentence pursuant to 28 U.S.C. § 2255 on the basis that a postsentencing change in the Commission's policies frustrated the subjective intent of the sentencing judge.

Several other Supreme Court cases have analyzed the interaction between sentencing and parole in the process of deciding other issues.

The comments made in these cases have generally been in accord with the position outlined in *Addonizio.* *See United States v. Grayson,* 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1977); *Warden v. Marrero,* 417 U.S. 653, 658–59, 94 S.Ct. 2532, 2535–36, 41 L.Ed.2d 383 (1974); *Bradley v. United States,* 410 U.S. 605, 611 n. 6, 93 S.Ct. 1151, 1155 n. 6, 35 L.Ed.2d 528 (1973); *Morrissey v. Brewer,* 408 U.S. 471, 480, 92 S.Ct. 2593, 2599, 33 L.Ed.2d 484 (1972).

Conferees that the U.S. Parole Commission is joined in purpose by the Courts, the Congress and other Executive agencies in a continuing effort to instill respect for the law. *The Parole Commission* efforts in this regard are fundamental . . .

*Id.* at 358 (emphasis added).

In the face of these expressions of legislative intent, our conclusion is obvious. The PCRA authorizes the Commission to exercise its own independent judgment in measuring the severity of an offense and the need for accountability as a result thereof.[31]

### B. Constitutionality of the PCRA

Plaintiffs' challenge to the constitutionality of the PCRA rests on two grounds, both of which rely heavily on dicta appearing in the Third Circuit's GERAGHTY opinion. First, Plaintiffs assert that a statute authorizing the Commission to focus consideration almost exclusively on deterrence and retribution, "the very factors that are available to the sentencing judge," without giving weight to the prior determination of the judicial branch, impermissibly interferes with the province of the judiciary. *See, Geraghty,* 579 F.2d at 261. Second, Plaintiffs argue that the PCRA violates the separation of powers doctrine by effectively delegating the legislative function of "redrafting" criminal penalties without adequate standards. *Id.* at 263. We will consider each of these contentions in turn.

### 1. Impermissible Interference with the Judiciary

■ The charge that the PCRA unconstitutionally authorizes the Commission to usurp the sentencing power of the judiciary has been effectively answered by the observations of the district court in *Joost v. United States Parole Commission,* 535 F.Supp. 71 (D.Kan.1982). We find the reasoning of District Judge Rogers on this

issue so cogent that we reproduce a portion of it here:

At the outset, we note that there is no constitutional provision which explicitly provides or has been interpreted as providing that a judge must set or be able to predict the date of a defendant's actual release from prison whenever that might occur prior to the maximum term imposed. Congress has traditionally defined what behavior is criminal and prescribed the range of punishments to be imposed for such crimes. The sentencing court has traditionally been delegated the authority to select from the prescribed range the most appropriate sentence on consideration of the individual defendant and circumstances. To this day, the court designates in the judgment and commitment order the maximum time an individual may be required to serve for his crime. Furthermore, by selecting one of the statutory sentencing options setting the time of parole eligibility the court effectively designates the minimum term of imprisonment. The court then commits the defendant to the custody of the Attorney General for the time of the sentence. The sentence is executed by the Attorney General and his delegates within the executive branch of · Government. As part of the responsibility to execute sentences, Congress has permitted executive authorities to ameliorate punishment by awarding statutory good time. Another traditional method of amelioration of punishment is executive pardon. Parole is technically nothing more nor less than another form of amelioration or mitigation of punishment authorized and defined by Congress and carried out by an executive agency. The PCRA, effective in March, 1976, has not substantially altered this overall scheme. We conclude that no function entrusted to the judiciary by the United States

---

**31.** A few exhibits proffered by Plaintiffs during the trial on which we withheld our ruling remain to be discussed. Plaintiffs' Ex. Nos. 63–68, which are evaluations of the reorganization of the Parole Board, are irrelevant and are not admitted. Plaintiffs' Ex. No. 71, is admitted for the purpose of appeal. Plaintiffs' Ex. Nos. 72–74, depositions of Barbara Stone-Meierhoefer, Leslie T. Wilkins, and Peter Hoffman, are admitted.

Constitution has been delegated to the United States Parole Commission. *Id.* at 73–74.

Thus, the parole decision is no more within the province of the judiciary than is the assignment of an inmate to a particular institution for incarceration or to a security classification within the institution. *Id.* at 74. The sentencing judge may make recommendations about such matters, and under the PCRA the Commission is bound to consider his recommendation regarding parole, 18 U.S.C. § 4207, but the judge has no enforceable expectation that his wishes will be followed. *Id.*

We endorse the *Joost* opinion not only because we agree with the rationale propounded therein, but also because we believe that it comports with the position espoused by the Supreme Court in its most recent pronouncements. In *United States v. Addonizio,* 442 U.S. 178, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979), the Court compared the roles of the Commission and the courts:

> The decision as to when a lawfully sentenced defendant shall actually be released has been committed by Congress, with certain limitations, to the discretion of the Parole Commission .... *The authority of sentencing judges to select precise release dates is, by contrast, narrowly limited:* the judge may select an early parole date, but that guarantees only that the defendant will be considered at that time by the Parole Commission ... *the judge has no enforceable expectations with respect to the actual release of a sentenced defendant short of his statutory term .... the actual [release] decision is not his to make,* either at the time of sentencing or later ....

*Id.* at 189–90, 99 S.Ct. at 2242–43. *See also United States v. Grayson,* 438 U.S. 41, 47, 98 S.Ct. 2610, 2614, 57 L.Ed.2d 582 (1977). A footnote to this passage reinforces the separation drawn by the Court between sentencing and parole in even more striking terms. In footnote 15, Justice Stevens remarked that under 18 U.S.C. § 3651 *a trial judge is precluded from usurping the parole function* by splitting a lengthy sentence between a stated period of probation and imprisonment. *Addonizio,* 442 U.S. at 190 n. 15, 99 S.Ct. at 2243 n. 15. Furthermore, the scheme outlined by the Court in *Addonizio* is consistent with previous opinions in which the Supreme Court distinguished release decisions from parole eligibility determinations. The latter is part of punishment and the sentencing function; the former is made only after sentence has been entered and prosecution has terminated. *Bradley v. United States,* 410 U.S. 605, 611 n. 6, 93 S.Ct. 1151, 1154 n. 6, 35 L.Ed.2d 528 (1973). *See also Warden v. Marrero,* 417 U.S. 653, 658–59, 94 S.Ct. 2532, 2535–36, 41 L.Ed.2d 383 (1974); *Morrissey v. Brewer,* 408 U.S. 471, 480, 92 S.Ct. 2593, 2599, 33 L.Ed.2d 484 (1972).

Based on the foregoing principles, it follows that if the authority of the judiciary is limited to selecting the outer boundaries of the time to be served, and the parole function cannot manipulate the maximum and minimum sentence in any way, the Commission does not encroach upon the judicial function, even though it may consider the same factors in reaching a parole decision. Other courts are in accord with our conclusion that under the PCRA the Commission cannot usurp power which the judiciary does not possess. *See Priore v. Nelson,* 626 F.2d 211 (2d Cir.1980); *Moore v. Nelson,* 611 F.2d 434, 439 (2d Cir.1979), *Hawkins v. United States Parole Commission,* 511 F.Supp. 460, 461–62 (E.D.Va.1981), *aff'd,* 679 F.2d 881 (4th Cir.1982) (relying on *Addonizio*); *Wilden v. Fields,* 510 F.Supp. 1295, 1303 (W.D.Wis.1981) (citing *Moore*).

We believe also that our analysis is in harmony with the current interpretation of the separation of powers doctrine. In a recent discussion on the subject, the Supreme Court identified the proper inquiry as the extent to which the challenged statute prevents a branch of government from accomplishing its constitutionally assigned functions. *Nixon v. Administrator of General Services,* 433 U.S. 425, 443, 97 S.Ct. 2777, 2790, 53 L.Ed.2d 867 (1977). As we have previously stated, the powers delegated to the Commission can not interfere with

the power of the court to designate the actual sentence, or the date of parole eligibility.

### 2. Unconstitutional Delegation of Legislative Function

■ Plaintiffs' argument that the PCRA permits the Commission to "redraft" federal criminal penalties is misplaced. It is clear from the foregoing analysis of the interaction between the statutory maximum, the sentence imposed, and the parole release date, that the guidelines do not perform any such function. The federal criminal statutes, on the one hand, fix the maximum penalties for the crimes they define. The guidelines, on the other hand, operate *within* the limits set by the statute, as well as within the confines of the sentence. Moreover, as Defendants point out, the guidelines specify time ranges for the *typical* length of imprisonment before parole, as opposed to *maximum* time periods set by statute, for various combinations of offense severity and offender characteristics. It is true that the severity ratings do not necessarily track the statutory sentence lengths, *see Geraghty,* 579 F.2d at 262 n. 115, but there is no constitutional or statutory requirement that they do so. *See Priore v. Nelson,* 626 F.2d 211 (2d Cir.1980); *Moore v. Nelson,* 611 F.2d 434, 439 (3d Cir.1979);

*Wilden v. Fields,* 510 F.Supp. 1295, 1302–03 (W.D.Wis.1981). *See also* Section IV.A.3. *supra.*

In view of this conclusion, we need not reach the question of whether the standards contained in the PCRA are constitutionally adequate. Nevertheless, in our opinion the statutory criteria enunciated in 18 U.S.C. § 4206 are sufficiently specific to withstand an attack on the ground that the PCRA does not provide adequate standards to guide the Commission in the exercise of its discretion. We note that the Supreme Court has broadly interpreted the power to delegate, and has declared statutes unconstitutional on this basis on only two occasions. *See Schechter Poultry Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935); *Panama Refining Co. v. Ryan,* 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935).

## V. CONCLUSION

To summarize, based on the foregoing findings of fact and our discussion thereof, we make the following conclusions of law:

First, the parole guidelines and regulations are a valid exercise of the Commission's authority under the PCRA; and

Second, the PCRA does not violate the Constitution of the United States.

## APPENDIX I

### ADULT GUIDELINES FOR PAROLE DECISIONMAKING

| Offense characteristics-severity of offense behavior (examples) | Offender characteristics-parole prognosis (SFS 81) (salient factor score) | | | |
| --- | --- | --- | --- | --- |
| | Very Good (10–8) | Good (7–6) | Fair (5–4) | Poor (3–0) |
| **Low**<br>Alcohol or cigarette law violations, including tax evasion (amount of tax evaded less than $2,000) [1].<br>Gambling law violations (no managerial or proprietary interest).<br>Illicit drugs, simple possession . . . . . . . . . . . . . . . . . . . . .<br>Marihuana/hashish, possession with intent to distribute/sale [very small scale (e.g., less than 10 lbs. of marihuana/less than 1 lb of hashish/less than .01 liter of hash oil)].<br>Property offenses (theft, income tax evasion, or simple possession of stolen property) less than $2,000. | ≤6 mo . . . . . . . . | 6 to 9 mo . . . . . | 9 to 12 mo . . | 12 to 16 mo. |

ADULT GUIDELINES FOR PAROLE DECISIONMAKING—Continued

| Offense characteristics-severity of offense behavior (examples) | Offender characteristics-parole prognosis (SFS 81) (salient factor score) | | | |
|---|---|---|---|---|
| | Very Good (10–8) | Good (7–6) | Fair (5–4) | Poor (3–0) |
| **Low Moderate**<br>Counterfeit currency or other medium of exchange [(passing/possession) less than $2,000].<br>Drugs (other than specificially categorized), possession with intent to distribute/sale [very small scale (e.g., less than 200 doses)].<br>Marihuana/hashish, possession with intent to distribute/sale [small scale (e.g., 10–49 lbs. of marihuana/1–4.9 lbs. hashish/.01–.04 liters of hash oil)].<br>Cocaine, possession with intent to distribute/sale [very small scale (e.g., less than 1 gram of 100% purity, or equivalent amount)].<br>Gambling law violations—managerial or proprietary interest in small scale operation [e.g., Sports books (estimated daily gross less than $5,000); Horse books (estimated daily gross less than $1,500); Numbers bankers (estimated daily gross less than $750)].<br>Immigration law violations . . . . . . . . . . . . . . . . . . . . . .<br>Property offenses (forgery/fraud/theft from mail/embezzlement/interstate transportation of stolen or forged securities/receiving stolen property with intent to resell) less than $2,000. | ≦8 mo | 8 to 12 mo | 12 to 16 mo | 16 to 22 mo. |
| **Moderate**<br>Automobile theft (3 cars or less involved and total value does not exceed $19,999) [2].<br>Counterfeit currency or other medium of exchange [(passing/possession) $2,000–$19,999].<br>Drugs (other than specificially categorized), possession with intent to distribute/sale [small scale (e.g., 200–999 doses)].<br>Marihuana/hashish, possession with intent to distribute/sale [medium scale (e.g., 50–199 lbs. of marihuana/5–19.9 lbs. of hashish/.05–.19 liters of hash oil)].<br>Cocaine, possession with intent to distribute/sale [small scale (e.g., 1.0–4.9 grams of 100% purity, or equivalent amount)].<br>Opiates, possession with intent to distribute/sale [evidence of opiate addiction and very small scale (e.g., less than 1.0 grams of 100% pure heroin, or equivalent amount)].<br>Firearms Act, possession/purchase/sale (single weapon; not sawed-off shotgun or machine gun).<br>Gambling law violations—managerial or proprietary interest in medium scale operation [e.g., Sports books (estimated daily gross $5,000–$15,000); Horse books (estimated daily gross $1,500–$4,000); Numbers bankers (estimated daily gross $750–$2,000)].<br>Property offenses (theft/forgery/fraud/embezzlement/interstate transportation of stolen or forged securities/income tax evasion/receiving stolen property) $2,000–$19,999.<br>Smuggling/transporting of alien(s) . . . . . . . . . . . . . . . . | 10 to 14 mo | 14 to 18 mo | 18 to 24 mo | 24 to 32 mo. |

ADULT GUIDELINES FOR PAROLE DECISIONMAKING—Continued

| Offense characteristics-severity of offense behavior (examples) | Offender characteristics-parole prognosis (SFS 81) (salient factor score) | | | |
| --- | --- | --- | --- | --- |
| | Very Good (10–8) | Good (7–6) | Fair (5–4) | Poor (3–0) |
| **High**<br>Carnal knowledge [3] .............................<br>Counterfeit currency or other medium of exchange [(passing/possession) $20,000–$100,000].<br>Counterfeiting [manufacturing (amount of counterfeit currency or other medium of exchange involved not exceeding $100,000)].<br>Drugs (other than specifically listed), possession with intent to distribute/sale [medium scale (e.g., 1,000–19,999 doses)].<br>Marihuana/hashish, possession with intent to distribute/sale [large scale (e.g., 200–1,999 lbs. of marihuana/20–199 lbs. of hashish/.20–1.99 liters of hash oil)].<br>Cocaine, possession with intent to distribute/sale [medium scale (e.g., 5–99 grams of 100% purity, or equivalent amount)].<br>Opiates, possession with intent to distribute/sale [small scale (e.g., less than 5 grams of 100% pure heroin, or equivalent amount) except as described in moderate].<br>Firearms Act, possession/purchase/sale (sawed-off shotgun(s), machine gun(s), or multiple weapons).<br>Gambling law violations—managerial or proprietary interest in large scale operation [e.g., Sports books (estimated daily gross more than $15,000); Horse books (estimated daily gross more than $4,000); Numbers bankers (estimated daily gross more than $2,000)].<br>Involuntary manslaughter (e.g., negligent homicide) ....<br>Mann Act (no force—commercial purposes) ...........<br>Property offenses (theft/forgery/fraud/embezzlement/interstate transportation of stolen or forged securities/income tax evasion/receiving stolen property) $20,000–$100,000.<br>Threatening communications (e.g., mail/phone)—not for purposes of extortion and no other overt act. | 14 to 20 mo | 20 to 26 mo | 26 to 34 mo | 34 to 44 mo. |
| **Very High**<br>Robbery—(1 or 2 instances) ......................<br>Breaking and entering—armory with intent to steal weapons.<br>Breaking and entering/burglary—residence; or breaking and entering of other premises with hostile confrontation with victim.<br>Counterfeit currency or other medium of exchange [(passing/possession/manufacturing) amount more than $100,000 but not exceeding $500,000].<br>Drugs (other than specifically listed), possession with intent to distribute/sale [large scale (e.g., 20,000 or more doses) except as described in Greatest I].<br>Marihuana/hashish, possession with intent to distribute/sale [very large scale (e.g., 2,000 lbs. or more of marihuana/200 lbs. or more of hashish/2 liters or more of hash oil)].<br>Cocaine, possession with intent to distribute/sale [large scale (e.g., 100 grams or more of 100% purity, or equivalent amount) except as described in Greatest I].<br>Opiates, possession with intent to distribute/sale [medium to a very large scale (e.g., 5 grams or more of 100% pure heroin, or equivalent amount) unless the offense is described in Greatest I or Greatest II].<br>Extortion [threat of physical harm (to person or property)].<br>Explosives, possession/transportation ...............<br>Property offenses (theft/forgery/fraud/embezzlement/interstate transportation of stolen or forged securities/income tax evasion/receiving stolen property) more than $100,000 but not exceeding $500,000. | 24 to 36 mo | 36 to 48 mo | 48 to 60 mo | 60 to 72 mo. |

ADULT GUIDELINES FOR PAROLE DECISIONMAKING—Continued

| Offense characteristics-severity of offense behavior (examples) | Offender characteristics-parole prognosis (SFS 81) (salient factor score) | | | |
|---|---|---|---|---|
| | Very Good (10–8) | Good (7–6) | Fair (5–4) | Poor (3–0) |

**Greatest I**

Aggravated felony (e.g., robbery: weapon fired or injury of a type normally requiring medical attention).

Arson or explosive detonation [involving potential risk of physical injury to person(s) (e.g., premises occupied or likely to be occupied)—no serious injury occurred].

Drugs (other than specifically listed), possession with intent to distribute/sale [managerial or proprietary interest and very large scale (e.g., offense involving more than 200,000 doses)].

Cocaine, possession with intent to distribute/sale [managerial or proprietary interest and very large scale (e.g., offense involving more than 1 kilogram of 100% purity, or equivalent amount)].

Opiates, possession with intent to distribute/sale [managerial or proprietary interest and large scale (e.g., offense involving more than 50 grams but not more than 1 kilogram (1000 grams) of 100% pure heroin or equivalent amount)].

Kidnaping [other than listed in Greatest II; limited duration; and no harm to victim (e.g., kidnaping the driver of a truck during a hijacking, driving him to a secluded location, and releasing victim unharmed)].

Robbery (3 or 4 instances) . . . . . . . . . . . . . . . . . . . . . . . . . . .

Sex act—force [e.g., forcible rape or Mann Act (force)] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

40 to 52 mo .. 52 to 64 mo .... 64 to 78 mo .... 78 to 100 mo.

**Greatest II**

Murder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Voluntary manslaughter . . . . . . . . . . . . . . . . . . . . . . . . . .

Aggravated felony—serious injury (e.g., robbery: injury involving substantial risk of death, or protracted disability, or disfigurement) or extreme cruelty/brutality toward victim.

Aircraft hijacking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Espionage. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Opiates, possession with intent to distribute/sale [managerial or proprietary interest and very large scale (e.g., offense involving more than 1 kilogram (1000 grams) of 100% pure heroin or equivalent amount)].

Kidnaping (for ransom or terrorism; as hostage; or harm to victim).

Treason . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ......

52 + mo .... 64 + mo ...... 78 + mo . .... 100 + mo. Specific upper limits are not provided due to the limited number of cases and the extreme variation possible within category.

## APPENDIX II

### SALIENT FACTOR SCORE

Name————

Register Number—————

Item A: Prior conviction(s)/adjudications (adult or juvenile). ☐

None . . . . . . . . . . . . . . . . . . . . . . =3

One . . . . . . . . . . . . . . . . . . . . . . . =2

Two or Three . . . . . . . . . . . . . . . =1

Four or More . . . . . . . . . . . . . . . =0

Item B: Prior commitment(s) of more than 30 days (adult or juvenile.)

None . . . . . . . . . . . . . . . . . . . . . . =2

One or Two . . . . . . . . . . . . . . . =1

Three or More . . . . . . . . . . . . . . =0

Item C: Age at Current Offense/ ☐ Prior Commitments.

Age at commencement of the current offense:

26 years of age or more. =2***

20–25 years of age . . . . . . =1***

19 years of age or less . . . =0

*** Exception: If five or more prior commitments of more than thirty days (adult or juvenile), place aan 'x' here —— and score this item = 0

Item D: Recent commitment free ☐ period (three years).

No prior commitment of more than thirty days (adult or juvenile) or released to the =1

community from last such commitment at least three years prior to the commencement of the current offense.

Otherwise ................. =1

Item E: Probation/parole/confinement/escape status violator this time. ☐

Neither on probation, parole, confinement, or escape status at the time of the current offense, nor committed as a probation, parole, confinement, or escape status violator this time. =1

Otherwise ................. =0

Item F: Heroin/opiate dependence. ☐

No history of heroin/opiate dependence. =1

Otherwise ................. =0

Total score .................... ☐

NOTE: For purposes of the Salient Factor Score, an instance of criminal behavior resulting in a judicial determination of guilt or an admission of guilt before a judicial body shall be treated as a conviction, even if a conviction is not formally entered.

[44 FR 26542, May 4, 1979; 44 FR 27391, May 10, 1979, as amended at 45 FR 6379, Jan. 28, 1980; 45 FR 44925, July 2, 1980; 45 FR 59871, Sept. 11, 1980; 46 FR 35638, July 10, 1981; 46 FR 36139, July 14, 1981; 46 FR 41494, Aug. 17, 1981; 46 FR 42842, Aug. 25, 1981]